# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707

---

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF PALATINE, a Municipal Corporation, Plaintiff-Appellee, v. PALATINE ASSOCIATES, LLC, an Illinois Limited Liability Corporation, SEARS ROEBUCK AND COMPANY, a New York Corporation, and ALL AMERICAN TITLE AGENCY, LLC, an Illinois Limited Liability Company, Defendants (All American Title Agency, LLC, an Illinois Limited Liability Company, Defendant-Appellant; Palatine Associates, LLC, an Illinois Limited Liability Corporation, Defendant-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2707 |
| Filed | March 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a condemnation proceeding in which plaintiff village sought to acquire a shopping center for use as a police facility and other municipal uses, the trial court's decision that a tenant pursuant to leases for two spaces in the center had no right to a share of the final award of just compensation was affirmed, since the record showed the tenant's leases were terminated and the tenant's right to any of the final award of just compensation was barred when the five-day notices the owner of the shopping center delivered to the tenant demanding the payment of past-due rent expired without payment prior to the entry of the final award. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-51257; the Hon. Alexander P. White, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Strecker, Jepson & Associates, of Lake Zurich (Paul H. Strecker and Christy J. Jepson, of counsel), for appellant. |
|---|---|
| | Ryan & Ryan, of Chicago (William E. Ryan, Timothy J. Ryan, Michael W. Ryan, and Lauren E. Ryan, of counsel), for appellee. |

| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Lampkin and Palmer concurred in the judgment and opinion. |

## OPINION

¶ 1    This appeal arises from a condemnation proceeding brought by the Village of Palatine[1] (Village), seeking to acquire real property in Palatine, Illinois, that was being used for a shopping center. The Village intends to acquire the property to be used as a police facility, with other municipal uses. The Village paid over $6 million to the owner, defendant Palatine Associates, LLC (Palatine Associates), in just compensation, and any claims of tenants was to be apportioned from the money received. Palatine Associates filed a motion requesting the trial court to find that appellant All American Title Agency, LLC (All American), had no interest in the final award of just compensation because its leases had terminated prior to the entry of the award. The court agreed and All American appeals, arguing that its leases were not terminated prior to the entry of the final award of just compensation. We affirm.

¶ 2                    BACKGROUND
¶ 3                    I. Leases
¶ 4    Palatine Associates was the owner of the property at issue in this case (subject property), which consisted of a shopping center with a number of tenants, including Sears and All American. All American was a tenant for two spaces and had entered into two written leases in 2005. The first lease, dated April 28, 2005, was for "approximately 7500 square feet" at 601 North Hicks Road (the 601 lease), for a lease term beginning June 1, 2005, and ending on May 31, 2015, with the option for All American to extend the lease for two additional option periods of five years each. The second lease, dated October 28, 2005, was for

---

[1]The Village was originally named a party to the instant appeal. However, on November 17, 2010, the appeal was dismissed as to the Village for lack of jurisdiction.

"approximately 2500 square feet" at 565 North Hicks Road (the 565 lease), for a lease term from November 1, 2005, through May 31, 2015, with the option for All American to extend the lease for two additional option periods of five years each. Both leases contained similar terms.

¶ 5 Article 2 of each lease provided:

"Tenant acknowledges that the premises are being accepted 'as is' and subject to the Landlord's obligations set forth in Exhibit B attached hereto. Landlord has not agreed to make any changes, additions or alterations in or to the Leased Premises or to perform any work therein, all of which shall be the sole obligation of Tenant and at Tenant's sole cost and expense, except as provided in Exhibit B."

¶ 6 The leases required All American to pay a fixed base rent, as well as "additional rent," defined as "Real Estate Taxes and CAM Charges[2] based upon Tenant's pro-rata share[ ] (capped at $3.00 per square foot through [the] initial lease term)." Article 4 of the leases stated that "Tenant shall pay to Landlord, *** as 'Fixed Base Rent' for the Premises during the term of this Lease without any deduction or setoff, except as expressly provided in this lease, the amount set forth in Section 1.1, in equal monthly installments, in advance, on the first day of each calendar month."

¶ 7 Article 5 of the 565 lease explained how to calculate taxes:

"Commencing on the Commencement Date TENANT shall pay, as additional rent, TENANT'S proportionate share of all real estate taxes and assessments*** for each calendar year during the term hereof[.] *** For purposes of this Lease, TENANT'S proportionate share shall be deemed 1.50%. (2500 out of 167,142 sq. ft.)

During the term of this Lease, TENANT shall pay to LANDLORD, monthly in advance, an amount equal to one-twelfth (1/12th) of TENANT'S proportionate share of real estate taxes and assessments for the current year, as reasonably estimated by LANDLORD. Such amount is currently estimated to be $2.00 per square foot. If TENANT'S proportionate share of taxes with respect of any tax year is less than the total amount theretofore paid by TENANT for such period, the excess shall be credited against the rent next becoming due or promptly refunded if no rent remains due. If TENANT'S proportionate share of taxes for any year promptly exceeds the total amount theretofore paid by TENANT for such period, TENANT shall, within 30 days after receipt of invoices from LANDLORD and a copy of real estate tax bill, pay the difference between the actual amount paid by TENANT and TENANT'S proportionate share of real estate taxes and assessments."

Article 5 of the 601 lease is identical except that the 601 lease deemed All American's proportionate share of taxes to be 4.49%. Article 6 of the leases provided that "the additional rent for real estate taxes and CAM shall not exceed $3.00 per square foot. Tenant shall not be responsible for payment of any real estate taxes or CAM, incurred or paid prior to

---

[2]"CAM Charges" are "common area maintenance costs and charges and expenses incurred in the ownership and operation of the Shopping Center."

December 1, 2006. CAM and Taxes shall be capped at $3.00 per foot during the original lease term." Article 6 further provided:

> "During the 60-day period immediately following Landlord's delivery of any annual statement to taxes or CAM Charges, Tenant shall have the right to inspect Landlord's accounting records relating to Taxes or CAM Charges (as applicable to the statement delivered) at Landlord's or its agent's office, upon reasonable prior notice. Unless Tenant shall take written exception to any item in any such statement within said 60-day period, such statement shall be considered final and accepted by Tenant. Any payment due to Landlord or credit or payment due to Tenant as shown on any such statement shall be paid or applied in the manner and within the time period described herein, whether or not written exception is taken thereto, provided that such payment or application shall be without prejudice to any such written exception."

¶ 8     Article 12 of the leases provided the following concerning repairs by Palatine Associates:

> "Landlord[ ] shall keep the foundations, roof, parking areas, Common Areas and structural portions of the walls of the Premises in good condition and repair, except for repairs required thereto by reason of the acts or omissions of Tenant, Tenant's employees, agents, invitees, licensees, or contractors. Tenant shall reimburse Landlord for such repairs, replacement and maintenance as described in Article 6 of this Lease provided in no event shall Tenant be responsible for any repair or replacement costs for the foundations, structural portions of the walls, load bearing items, plumbing, utility lines, pipes and conduits inside or outside the Premises and/or common areas unless the repair or replacement is caused by Tenant, its employees, customers or invitees. Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs. The provisions of this Paragraph shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which event the obligations of Landlord shall be controlled by either Article 14 or Article 16 hereof. If [Landlord] fails to make the required repairs under the lease within a reasonable time, then Tenant may make said repairs and offset against rent."

¶ 9     Article 16 of the leases referred to eminent domain proceedings and provided that "Tenant shall share in any condemnation award for the difference between MV[3] of the space and rent being paid for remaining term of the lease." Article 17 applied to any default by the lessee:

> "If Tenant defaults in the payment of Fixed Base Rent or other charges or in the performance of any other of Tenant's obligations hereunder, and fails to remedy such default within five (5) days after written notice from Landlord *** then and in any such instance, without further notice to Tenant, except to the extent required by law, Landlord may enter upon the Premises and terminate this Lease. In the event of such termination the obligations of Landlord hereunder shall cease without prejudice, however, to the right of Landlord to recover from Tenant any sums due Landlord for rent or otherwise to the

---

[3]"MV" is not defined in the lease, but likely means market value.

date of such entry ***."

¶ 10    Article 24 of the leases concerns breach of the leases by Palatine Associates:

"If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center as the same may then be encumbered and neither Landlord nor if Landlord be a partnership, any of the partners comprising such partnership shall be liable for any deficiency. Tenant may also offset its judgment against rents."

¶ 11    Article 26 of the leases set forth various miscellaneous provisions:

"(a) Accord and Satisfaction. No payment by Tenant or receipt by Landlord of a lesser amount than the rental or other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying such check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or other charges or pursue any other remedy provided for in this Lease or available at law or in equity.

(b) Waiver. No waiver of any condition or legal right or remedy shall be implied by the failure of Landlord to declare a forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it be in writing signed by the Landlord. ***

* * *

(f) Entire Agreement. This Lease and exhibits attached hereto set forth all of the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as otherwise provided no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

This Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, lease proposals, brochures, representations, and information conveyed, whether oral or in writing, between the parties hereto or their respective representatives or any other person purporting to represent the Landlord or the Tenant. The Tenant acknowledges that it has not been induced to enter into this Lease by any representations not set forth in this Lease,[4] shall be used in the interpretation or construction of this Lease, and the Landlord shall have no liability for any consequences arising as a result of any such representations."

---

[4]While it appears that a word may be missing from the sentence, the quoted language is as it appears in the record.

¶ 12    Article 29 of the 601 lease, concerning "Landlord Representations," provided:

"Landlord represents to Tenant that the existing HVAC system and equipment servicing the Premises is, as of the date of this Lease, in good working order. Landlord further represents to the best of Landlord[']s knowledge to Tenant that the Shopping Center and the Premises are, as of the date of this Lease, in compliance with all applicable laws, rules, regulations and ordinances."

Article 29 of the 565 lease states that it was omitted intentionally.

¶ 13    Exhibit B, entitled "Landlord's Work," provides in entirety: "Landlord shall not perform any work whatsoever on the Premises. Tenant shall accept the Premises 'AS IS, WHERE IS AND WITH ALL FAULTS, IF ANY.' Landlord shall be responsible for the maintenance and replacement as needed of all Mechanical (HVAC), electrical systems, any fire sprinkler systems and other structural components." Exhibit C, entitled "Tenant's Work," provides in entirety: "The following items done over and above Landlord's scope of work shall be done by Tenant at the Tenant's expense: All work not detailed in Exhibit B."

¶ 14                          II. Condemnation Proceeding

¶ 15    On December 22, 2006, the Village filed a complaint to condemn the subject property so that it could build a police station, with other municipal uses. In its complaint, the Village sought "to acquire fee simple title in and to the real property, together with all improvements and appurtenances attached to and part of said real estate" described in its legal description. In its prayer for relief, the Village asked "[t]hat plaintiff, by this proceeding, acquire the ownership of the said property in fee simple, free from all liens and claims whatsoever." All American was named as a party defendant to the complaint and was served with process, and there is no claim that it did not receive all required notices.

¶ 16    On June 9, 2009, All American made an oral motion for leave to file a traverse and motion to dismiss the complaint for condemnation, which was denied on the same day. Also on June 9, 2009, the condemnation court[5] entered an agreed final judgment order concerning the Village's condemnation action. The order provided just compensation for "the fee simple title to real property described in [the Village's] complaint to condemn ***, subject only to the lease of Sears and excluding any interest of Sears" for $6.15 million.

¶ 17    On July 6, 2009, the condemnation court entered an order vesting title to the subject property in the Village, subject to the lease of Sears. The order also authorized the Village to take immediate possession of the subject property other than that portion occupied by Sears.

¶ 18    On July 9, 2009, the condemnation court allowed Palatine Associates to withdraw the bulk of the award of $6.15 million, ordering $2 million to be retained by the Cook County treasurer pending tenants' interest in the award. On July 13, 2009, the condemnation court ordered the remaining $2 million to be paid to Palatine Associates' attorney as escrowee to

_____

[5]Due to the number of courts involved in this case, we refer to the court deciding the condemnation case as the "condemnation court" for the sake of clarity.

be deposited in an interest-bearing account pending a determination of claims filed by several tenants, including All American.

¶ 19 On November 2, 2009, the Village filed a motion with the condemnation court for immediate possession of the subject property, excluding that portion occupied by Sears, because All American refused to relinquish possession. The motion stated that during the hearing in which the order vesting title was entered, All American represented that it had no objection to the entry of the order vesting title. However, as of the date of the Village's motion, All American remained on the subject property and refused to relinquish possession; All American also had not paid any rent to the Village since the date title vested in the Village, nor had it contacted the Village to request permission to remain on the premises. On November 6, 2009, the condemnation court ordered possession of the property to the Village after seven days from the entry of the order. On November 24, 2009, the circuit court entered an agreed order that All American could remain in possession until December 31, 2009, and would pay $500 for the use and occupancy.

¶ 20 On December 3, 2009, Palatine Associates filed a motion to release $300,000 being held in escrow and on December 4, 2009, the condemnation court ordered the escrowee to pay that amount to Palatine Associates.

¶ 21 III. Forcible Entry and Detainer and Bankruptcy Actions

¶ 22 On August 7, 2007, during the pendency of the condemnation action, Palatine Associates served All American with a "Notice of Termination of Tenancy" (the five-day notice). The notice stated:

> "You are hereby notified that your tenancy or lease of the following described premises, to wit: 565 N Hicks Rd Palatine, Illinois, together with all other accommodations used by you in connection therewith, will be terminated as follows,"

and then listed three options: one concerning non-payment of rent, one concerning other breaches, and one terminating a week-to-week, month-to-month, or holdover tenancy. Palatine Associates had checked the box next to the first option, which provided:

> "There is due the undersigned for accrued and past-due rental for said accommodations aforesaid the sum of Eight Thousand Three Hundred Eighty-three and 32/100 Dollars ($8383.32), for which demand is herewith made, and unless payment is made within five (5) days from the date of service hereof, your tenancy is terminated. *Only FULL PAYMENT of the rent demanded in this notice will waive the landlord's right to terminate the lease under this notice, unless the landlord agrees in writing to continue the lease in exchange for receiving partial payment.*" (Emphasis in original.)

The notice ended by stating: "Unless you promptly comply with the above, suit will be instituted for possession, and for rental due, together with the costs of such proceeding." On the same day, Palatine Associates also served a "Notice of Termination of Tenancy" for the 601 lease, which was identical to the notice provided for the 565 lease, except that the amount owed under the 601 lease was $25,225.

¶ 23   Shortly thereafter,[6] Palatine Associates filed two forcible entry and detainer complaints alleging that All American unlawfully withheld possession of each of the properties and requested damages in the case of the 601 lease in the amount of $25,000 and in the case of the 565 lease in the amount of $8,333.32.

¶ 24   On January 28, 2009, the eviction court[7] entered orders in each forcible entry and detainer action concerning a motion *in limine* filed by Palatine Associates and stated in relevant part:

"1. Article 26(f) of the Lease between Plaintiff and Defendant is clear and contains no ambiguities and is controlling between the parties as to other oral or written statements not set forth in the Lease;

2. Defendants are barred from offering testimony as to any oral or written representations allegedly made by Plaintiff to Defendant that are not set forth in the Lease between the parties;

3. Article II of the Lease defines the premises rented by Defendant and includes common areas described in that Article."

¶ 25   On June 19, 2009,[8] Palatine Associates filed two identical motions for summary judgment in the forcible entry and detainer cases, one in the case concerning the 565 lease and one in the case concerning the 601 lease. The motions explained that All American had raised three affirmative defenses: (1) that it was entitled to a setoff for the cost of repairs and no rent was due at the time of the five-day notice; (2) that Palatine Associates agreed to defer full payment under the leases until the condemnation court rendered a decision and, in addition, Palatine Associates waived its right to strict compliance with the leases by accepting a partial payment of $4,000; and (3) that Palatine Associates knew or should have known when the lease was signed that there were ordinance violations and so, due to its breach and its unclean hands, it should not be permitted to recover from All American. Palatine Associates claimed that all three affirmative defenses were lacking in merit (1) under Illinois law, (2) under the terms of the leases, (3) under the five-day notices, and (4) pursuant to the January 28, 2009, ruling on Palatine Associates' motion *in limine*.

¶ 26   Attached to the motions for summary judgment were affidavits from John Argianas, one of the managers of Palatine Associates. Argianas stated that in his capacity as manager, he negotiated the terms of both leases and was familiar with the terms and provisions of the leases. He further stated that All American never gave written notice to Palatine Associates of any repairs that were needed, nor did it make any required repairs under the lease. As a

[6]The parties agree that the forcible entry and detainer complaints were filed on August 23, 2007, but the copies of the complaints in the record do not indicate the date the complaints were filed.

[7]Due to the number of courts involved in this case, we refer to the court deciding the forcible entry and detainer actions as the "eviction court" for the sake of clarity.

[8]Palatine Associates states that it filed its motions for summary judgment on June 19, 2009, and the notices of motion list the service date as June 19, 2009. However, the copies of the motions for summary judgment in the record on appeal are not file-stamped.

result, All American was not entitled to an offset against rent. Argianas stated that he caused the five-day notices to be served upon All American, which was at that time in arrears in the amount of $8,383.32 on the 565 lease and $25,225 on the 601 lease. During October 2007, All American tendered and Palatine Associates accepted a partial payment of $4,000 in rent, but the remaining balance was not tendered. As of June 19, 2009, the date of the affidavit, Argianas stated that All American was in arrears in the amount of $31,783.31 on the 565 lease and $157,600 on the 601 lease. Finally, Argianas stated that All American remained in possession of the property.

¶ 27 On September 2, 2009, All American filed a notice of removal of the condemnation action to the United States District Court for the Northern District of Illinois. The notice of removal stated that All American had filed for chapter 11 bankruptcy[9] (26 U.S.C. § 101 *et seq.* (2006)) and the claims asserted by All American to the funds held in escrow were removable because they related to the bankruptcy case.

¶ 28 On October 29, 2009, the bankruptcy court entered an order to modify the automatic stay: (1) to allow the eviction court to rule upon the motions for summary judgment filed by Palatine Associates in the two forcible entry and detainer actions filed by Palatine Associates against All American and (2) to allow the condemnation court to determine whether All American had a claim for compensation in the condemnation action filed by the Village. On November 3, 2009, the bankruptcy court returned the case to the circuit court.

¶ 29 IV. All American's Interest in the Final Award of Just Compensation

¶ 30 On January 7, 2010, the eviction court entered an order in both forcible entry and detainer cases based on Palatine Associates' motion under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)) to vacate a dismissal for want of prosecution that had been entered on September 18, 2009. The order stated that at the time the dismissal was entered, there was a pending bankruptcy proceeding. Since an automatic stay would have been in effect at the time the dismissal was entered, the eviction court did not have the authority to enter it, and accordingly, the dismissal was vacated and the case was reinstated. The court further noted that on October 29, 2009, the bankruptcy court granted an order modifying the automatic stay to permit the eviction court to rule on the motions for summary judgment in both cases and permitting the condemnation court to determine whether All American had a claim for compensation. The eviction court found that Palatine Associates was no longer the owner of the property and therefore no longer entitled to possession; the court further found that the motions for summary judgment were moot and that Palatine Associates would need to proceed in bankruptcy court on its claim for back rent.

¶ 31 The eviction court then found that Palatine Associates terminated All American's lease by serving a five-day notice. However, Palatine Associates did not automatically obtain the

[9]The record reflects that All American filed for bankruptcy on August 13, 2009. All American's brief states that on the same day, it filed a counter- and cross-complaint for turnover of the escrowed funds to the bankruptcy estate. While that motion appears in the record, it is not file-stamped so it is unclear whether it was filed or when it was filed.

right to possession, which would only occur after the filing of a forcible entry and detainer complaint and a determination by the finder of fact that Palatine Associates was entitled to possession. The court concluded by stating that "[t]his Court makes no finding as to the right of possession other than the landlord terminated the Defendants' ten[a]ncy on August 14, 2007," and then dismissed the cases.

¶ 32    On January 6, 2010, Palatine Associates filed a motion, which was later amended, asking the condemnation court to determine that All American did not have a compensable interest in the final award of just compensation and requested that the $1,311,447.10 claimed by All American be disbursed to Palatine Associates. Palatine Associates characterized the motion as one for summary judgment and arising under sections 10-5-70 and 10-5-90 of the Eminent Domain Act (735 ILCS 30/10-5-70, 10-5-90 (West 2010)). The motion requested the court to determine as a matter of law that All American's leasehold was terminated in August 2007, determine that All American did not have a claim to the final award of just compensation, and further to order the escrowee to distribute the funds to Palatine Associates.

¶ 33    In response, All American claimed that it was entitled to a portion of the award of just compensation. It claimed that prior to entering into the leases, Palatine Associates made the following representations:

"a. the large parking lot used to accommodate Sears and the other tenants, including All American, was to be resurfaced with newly striped parking spaces;

b. the dilapidated sidewalks and brick support columns in front of, and adjacent to, the premises would be repaired or replaced;

c. the facade directly above, and in front of, the premises would be repaired or replaced to allow All American to post identity and advertising signage thereon which could be seen by persons from the main roadways adjacent to the parking lot; and

d. a substantial, creditworthy, retail store was going to sign a lease with Palatine Associates for the large, vacant space immediately adjoining All American's premises."

All American claimed that it expended approximately $200,000 in renovation costs to the interior of the premises in reliance on Palatine Associates' representations. All American further claimed that suit had been filed against Palatine Associates by the Village for a number of ordinance violations and that Palatine Associates failed to abide by its representations or its duties under the leases.

¶ 34    All American claimed that in May or June 2007, Palatine Associates agreed that All American would not be required to pay the monthly rent in strict compliance with the leases "due to the deteriorated condition of the premises and common areas and the pending condemnation case." Instead, the parties agreed "that Palatine Associates would be paid whatever amount All American could afford based upon its business income during the pendency of the condemnation proceeding" and further agreed that Palatine Associates would be paid the full amount of rent owed under the leases out of the proceeds of any award granted to All American pursuant to the condemnation proceedings.

¶ 35    All American claimed that Palatine Associates had waived its right to demand strict compliance with the terms of the leases by accepting partial payments of $4,000 in October

-10-

and December 2007. All American further claimed that Palatine Associates knew or should have known that the subject property had numerous ordinance violations and that All American relied upon its representations that no violations existed to its detriment. Finally, All American claimed that the July 6, 2009, order vesting title in the Village terminated the leases and since Palatine Associates no longer had any interest in the leased premises, the forcible entry and detainer actions were dismissed by the eviction court on December 28, 2009.

¶ 36    All American also claimed that the five-day notices were defective because, due to the leases' overstatement of the square footage of the leases premises, All American had actually overpaid its rent from December 1, 2005, through April 2007 and thus owed no rent at the time of their receipt of the five-day notices. All American further claimed that the five-day notices did not terminate the leases and only indicated that Palatine Associates was establishing a position to exercise its right to terminate the leases at some time in the future.

¶ 37    On August 11, 2010, the condemnation court issued a memorandum decision and order on three motions: (1) All American's motion for apportionment of the condemnation award, (2) Palatine Associates' motion for determination, and (3) Palatine Associates' motion for summary judgment. The court agreed with Palatine Associates, finding that All American's lease was terminated on August 14, 2007, at the expiration of the five-day notice period, and so All American did not have an interest in the property when the final award of just compensation was awarded on July 7, 2009. Accordingly, the court granted Palatine Associates' motion for a declaration that All American's lease was terminated, denied All American's motion for apportionment of the condemnation award, granted Palatine Associates' motion for summary judgment, and granted Palatine Associates' motion for disbursement of the final compensation award by the escrowee.

¶ 38    On September 10, 2010, All American filed a notice of appeal, asking the court to reverse the condemnation court's orders of June 9, 2009, in which the court entered an agreed final judgment order of just compensation in the amount of $6.15 million and August 11, 2010.

¶ 39    On February 16, 2011, the condemnation court entered an order for the escrowee to pay the balance of the final award of just compensation that was held in escrow to Palatine Associates and that if All American was successful on appeal, Palatine Associates would be responsible for paying the amount owed to All American.

¶ 40                                            ANALYSIS

¶ 41    On appeal, All American argues that the condemnation court erred in finding that its leases were terminated prior to the entry of the final award of just compensation and granting Palatine Associates' motion for summary judgment. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co*., 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*.

*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 42        "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 43        " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 44        In addition, this case concerns the condemnation court's interpretation of a contract as a matter of law. A contract construed as a matter of law by the trial court may be construed independently by a reviewing court, unrestrained by the trial court's judgment. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004) (citing *Lewis X. Cohen Insurance Trust v. Stern*, 297 Ill. App. 3d 220, 232 (1998), and *Zale Construction Co. v. Hoffman*, 145 Ill. App. 3d 235, 240 (1986)). Accordingly, our review from a trial court's interpretation of a contract as a matter of law is *de novo. Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005). As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 45        A lease is a contract between the landlord and tenant and normal principles of contract interpretation apply. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994); *Clarendon America Insurance Co. v. Prime Group Realty Services, Inc.*, 389 Ill. App. 3d 724, 729 (2009) (citing *Sears, Roebuck & Co. v. Charwill Associates, Ltd. Partnership*, 371 Ill. App. 3d 1071, 1076 (2007)). The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Fleet Business Credit*, 352 Ill App. 3d at 469 (citing *Schweihs v. Davis, Friedman, Zavett, Kane & MacRae*, 344 Ill. App. 3d 493, 500 (2003), *Zale Construction*, 145 Ill. App. 3d at 241, and *Ancraft Products Co. v. Universal Oil Products Co.*, 100 Ill. App. 3d 694, 697 (1981)). To determine the intent of the parties, the court must look to the instrument itself, its purpose and the surrounding circumstances of its execution and performance. *Fleet Business Credit*, 352 Ill. App. 3d at 469. "When a dispute exists between the parties as to the

-12-

meaning of a contract provision, the threshold issue is whether the contract is ambiguous." *Fleet Business Credit*, 352 Ill. App. 3d at 469 (citing *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002)). "Contractual language is ambiguous when it is ' "susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression." ' " *Fleet Business Credit*, 352 Ill. App. 3d at 469 (quoting *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 310 (2002), quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)). An ambiguity is not created simply because the parties do not agree upon an interpretation. *Fleet Business Credit*, 352 Ill. App. 3d at 469 (citing *Groshek v. Frainey*, 274 Ill. App. 3d 566, 569 (1995), *Zale Construction*, 145 Ill. App. 3d at 241, and *Harlem-Irving Realty, Inc. v. Alesi*, 99 Ill. App. 3d 932, 936 (1981)). Illinois courts follow the "four corners" rule when interpreting contracts, which requires:

> " ' "An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." ' " *Fleet Business Credit*, 352 Ill. App. 3d at 469-70 (quoting *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999), quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)).

¶ 46    In the case at bar, the condemnation court found that the leases had been terminated in August 2007, meaning that All American was not entitled to any portion of the award of just compensation entered in July 2009. On appeal, All American makes a number of arguments that it claims demonstrate that the leases were not terminated.

¶ 47                              I. Effect of Eviction Court Decision

¶ 48    We first address All American's claims concerning the effect of the eviction court's decision to terminate the forcible entry and detainer cases as moot. All American claims that the condemnation court did not have jurisdiction to determine whether the leases were terminated because only the eviction court had jurisdiction to make a finding as to the termination of the leases; when the eviction court found that the forcible entry and detainer actions were moot, the condemnation court was unable to "reopen a moot forcible action to decide the issues of a case where there is no longer a justiciable controversy." Furthermore, All American argues that since the condemnation award was paid by the Village prior to the entry of a judgment in the eviction court, the leases were only terminated at the time of the entry of the final award of just compensation. We do not find All American's argument persuasive.

¶ 49    Under the Eminent Domain Act, "the court in the same eminent domain proceeding in which the [condemnation] orders have been made shall have exclusive authority to hear and determine all rights in and to just compensation and shall make findings as to the rights of the parties." 735 ILCS 30/10-5-70(a) (West 2008). Thus, under the explicit language of the Eminent Domain Act, the condemnation court had the authority to determine whether All American had a right to the just compensation award, which required the determination of whether All American was a leaseholder at the time of the award. Additionally, in the

-13-

forcible entry and detainer actions, Palatine Associates sought to recover possession of the properties, as it claimed that All American had wrongfully withheld possession. The eviction court found the actions to be moot, since Palatine Associates was no longer the owner of the property after title had vested in the Village. However, the case at bar has nothing to do with Palatine Associates' ownership status but instead focuses on All American's status as a tenant. Thus, the fact that the eviction court found the cases before it to be moot is irrelevant to the determination in the instant case and the condemnation court's authority to decide whether All American had a right to the compensation award.

¶ 50       Finally, we find All American's reliance on *Department of Public Works & Buildings v. Bohne*, 415 Ill. 253 (1953), and *Bohne v. Bauer*, 21 Ill. App. 2d 133 (1959), to be unpersuasive. All American uses the cases, both of which arise under the same facts, to argue that it should be entitled to a portion of the just compensation award because it was a tenant in possession with no judgment entered against it by the eviction court on the day the award was paid by the Village. However, neither case concerns the issue of whether the tenant was entitled to a portion of the just compensation award; further, it does not appear that the landlord objected at all to the tenant's claim. Additionally, neither case concerns a forcible entry and detainer action by the landlord, so neither the appellate court nor the Illinois Supreme Court considered the effect of an eviction action on the tenant's claim. In fact, *Bohne*, the appellate court case, concerned the question of when the *landlord's* interest in the property terminated, not the tenant's. See *Bohne*, 21 Ill. App. 2d at 134 (noting that the issue was determining the point in a condemnation action at which the landlord's title was extinguished). Thus, neither of these cases assists All American in its argument. Since we have determined that the condemnation court had the authority to decide when the leases were terminated, we proceed to consider the condemnation court's conclusion that the leases were terminated in August 2007.

¶ 51       In the case at bar, the condemnation court determined that the leases were terminated at the expiration of the five-day notice period. All American argues that the condemnation court erred in its determination because the five-day notices did not terminate the leases as a matter of law, and there are questions of fact as to whether the five-day notices were effective.

¶ 52       We first consider All American's arguments concerning the effect and validity of the five-day notices. All American argues that the five-day notices did not terminate the leases but only provided notice of Palatine Associates' right to terminate the leases at some point in the future. Additionally, All American argues that there is a question of fact as to the five-day notices' validity, because the amounts due in the notices were incorrect due to the leases' inaccurate computation of rent, taxes, and CAM charges.

¶ 53                      II. Whether the Five-Day Notices Terminated the Leases

¶ 54       All American argues that the five-day notices did not terminate the leases but that the leases were instead terminated at the time the condemnation award was paid. Given that the eviction court did not enter a judgment prior to the entry of the condemnation award, we must determine whether the termination occurred at the expiration of the five-day notices or at the time the award was paid. If the leases were terminated prior to the entry of the

-14-

condemnation award, All American is not entitled to a portion of the award; if the entry of the award terminated the leases, All American is entitled to compensation.

¶ 55    The five-day notice for the 565 lease stated:

"You are hereby notified that your tenancy or lease of the following described premises, to wit: 565 N Hicks Rd Palatine, Illinois, together with all other accommodations used by you in connection therewith, will be terminated as follows,"

and then listed three options: one concerning non-payment of rent, one concerning other breaches, and one terminating a week-to-week, month-to-month, or holdover tenancy. Palatine Associates had checked the box next to the first option, which provided:

"There is due the undersigned for accrued and past-due rental for said accommodations aforesaid the sum of Eight Thousand Three Hundred Eighty-three and 32/100 Dollars ($8383.32), for which demand is herewith made, and unless payment is made within five (5) days from the date of service hereof, your tenancy is terminated. *Only FULL PAYMENT of the rent demanded in this notice will waive the landlord's right to terminate the lease under this notice, unless the landlord agrees in writing to continue the lease in exchange for receiving partial payment*." (Emphasis in original.)

The notice ended by stating: "Unless you promptly comply with the above, suit will be instituted for possession, and for rental due, together with the costs of such proceeding." The five-day notice for the 601 lease was identical to the notice provided for the 565 lease, except that the amount owed under the 601 lease was $25,225.

¶ 56    All American argues that the five-day notices did not terminate the leases but only indicated that Palatine Associates had the right to terminate the leases. In support, All American points to the leases, which provide:

"If Tenant defaults in the payment of Fixed Base Rent or other charges or in the performance of any other of Tenant's obligations hereunder, and fails to remedy such default within five (5) days after written notice from Landlord *** then and in any such instance, without further notice to Tenant, *except to the extent required by law*, Landlord *may* enter upon the Premises and terminate this Lease." (Emphasis added.)

All American argues that the law requires Palatine Associates to receive a judgment for possession, at which point Palatine Associates would have the option of terminating the leases. We do not find this argument persuasive. As Palatine Associates notes, the notices specifically state that "unless payment is made within five (5) days from the date of service hereof, your tenancy *is terminated*." (Emphasis added.) The language of the notices does not state that Palatine Associates would reserve the right to terminate the lease but instead clearly states that the lease would be terminated if payment was not made.

¶ 57    We find *Elliott v. LRSL Enterprises, Inc.*, 226 Ill. App. 3d 724 (1992), which All American cites to show that termination of a tenancy and termination of a lease are distinct, to be inapposite. *Elliott* did not involve a five-day notice but instead concerned interpretation of an agreed order. It was necessary to determine whether the phrase " 'tenancy is terminated' " in the agreed order meant that the lease, which contained a reservation of remedy provision, was no longer effective. *Elliott*, 226 Ill. App. 3d at 730. The court determined that the entry of the agreed order in the context of a forcible entry and detainer

proceeding meant that the phrase " 'termination of tenancy' " concerned termination of the tenant's right of possession in the property and did not terminate the privity of contract between the landlord and tenant where the lease contained a provision to the contrary. *Elliott*, 226 Ill. App. 3d at 731. In the case at bar, the five-day notice specifically noted that rent was due under the lease and that the "tenancy is terminated" if that rent was not paid. Thus, unlike *Elliott*, the issue here squarely concerns the language of the lease and the five-day notice served pursuant to that lease.

¶ 58 In the case at bar, as noted, the five-day notice specifically said that All American's tenancy "is terminated" in the event that the rent due was not paid. Thus, unlike All American's other cases, the language of the five-day notice makes it clear that Palatine Associates was not reserving the right to terminate the leases but was in fact terminating the leases after the passage of the time in the notices. Accordingly, the five-day notices terminated All American's leases in August 2007 at the end of the five-day period of time when All American did not pay all of its past-due rent, making All American not entitled to a portion of the just compensation award.

¶ 59 III. All American's Defenses to Five-Day Notices

¶ 60 All American also argues that the condemnation court should not have found the leases terminated by the five-day notices because there are questions of fact as to whether the five-day notices were effective. All American claims that the square footage under the leases was inaccurate, making the computations of rent due, taxes due, and CAM charges due likewise inaccurate, since they were based on the square footage of the leased premises. In fact, All American claims that, had the rent, taxes, and CAM charges been properly calculated, it would have overpaid the amount due, meaning that there was no past-due rent at the time the notices were issued. All American additionally claims that it was not required to pay taxes or CAM charges until 2008 and challenges the sufficiency of the affidavit submitted in support of Palatine Associates' motion. Finally, All American argues that Palatine Associates was estopped from challenging the leases because of its own breaches.

¶ 61 Initially, we note that All American does not claim that it paid the rent due under its leases after April 2007. Instead, All American claims that in May or June 2007, it orally agreed with Palatine Associates to pay a lesser amount, based on the level of deterioration of the rest of the subject property, and submitted two payments in the amount of $4,000 each for rent in October and December 2007. We consider whether the acceptance of these lesser amounts prevents Palatine Associates from challenging the leases below, but for the purposes of considering the effectiveness of the five-day notices, it is sufficient to note that All American acknowledges that it did not pay the amounts due under the leases after April 2007.

¶ 62 A. *Affidavit*

¶ 63 We first address All American's arguments concerning the affidavit filed by Palatine Associates. Palatine Associates attached the motions for summary judgment from the forcible entry and detainer cases to their motion before the condemnation court. Attached to

the motions for summary judgment were affidavits from John Argianas, one of the managers of Palatine Associates. Argianas stated that in his capacity as manager, he negotiated the terms of both leases and was familiar with the terms and provisions of the leases. He further stated that All American never gave written notice to Palatine Associates of any repairs that were needed, nor did it make any required repairs under the lease. As a result, All American was not entitled to an offset against rent. Argianas stated that he caused the five-day notices to be served upon All American, which was at that time in arrears in the amount of $8,383.32 on the 565 lease and $25,225 on the 601 lease. During October 2007, All American tendered and Palatine Associates accepted a partial payment of $4,000 in rent, but the remaining balance was not tendered. As of June 19, 2009, the date of the affidavit, Argianas stated that All American was in arrears in the amount of $31,783.31 on the 565 lease and $157,600 on the 601 lease. Finally, Argianas stated that All American remained in possession of the property.

¶ 64    All American claims that Argianas' affidavits do not comply with Illinois Supreme Court Rule 191(a) (eff. July 1, 2002) because they were conclusory and insufficient to prove that any rent was due at the time the five-day notices were issued.[10] We note that All American did not raise this argument before the condemnation court. An argument that has not been raised in the trial court cannot be raised for the first time on appeal, even in the case of a summary judgment. *Lajato v. AT&T, Inc.*, 283 Ill. App. 3d 126, 136 (1996). While it claims to have been justified, All American does not dispute that it has not paid the contractual amount due under the leases since April 2007. Thus, Argianas' affidavits are not necessary to prove that proposition.

¶ 65                              B. *Square-Footage Calculations*

¶ 66    All American also argues that the square-footage calculations in the leases were incorrect, making the rent, taxes, and CAM charges due inaccurate, since they all relied on a calculation based on the square footage of the leased premises. We do not find this argument persuasive. As Palatine Associates notes, there is no indication that All American disagreed with the square-footage calculation in the leases until it defaulted in its rent payments. Moreover, the leases list the square footage as "approximately 7500 square feet" in the 601 lease and "approximately 2500 square feet" in the 565 lease. Thus, by their very terms, the leases do not purport to list an exact measurement of the leased premises. Despite this fact, All American agreed to use the figures of 2,500 and 7,500 as the square footage for the calculation of the rent, taxes, and CAM charges; indeed, the leases make the formulas for calculating the amounts due perfectly clear. We cannot find that All American was entitled to pay a lesser amount merely because the actual square footage of the premises differed from the approximation listed in the leases.

---

[10]All American challenges only the portion of Argianas' affidavits in which he states the amount of rent due. It does not make any argument as to any other aspects of the affidavits, such as Argianas' statements that All American did not give written notice concerning required repairs or make the repairs itself.

¶ 67    The only case All American cites in support of its argument is *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119 (2008), in which the appellate court considered whether a condominium developer breached its purchase agreements with buyers when the measurements of the condominium units were different than in the developer's floor plans. All American uses *Kirkpatrick* to state that a duty of good faith and fair dealing is implied in every contract or lease. See *Kirkpatrick*, 385 Ill. App. 3d at 131. However, more applicable to the case at bar is *Kirkpatrick*'s discussion of the plaintiffs' breach of contract claims concerning the square footage of the units. The contracts signed by the plaintiffs stated that all dimensions were approximate, and the appellate court noted that since the contracts contained those statements, the trial court did not err in finding that the contracts were not breached. *Kirkpatrick*, 385 Ill. App. 3d at 129. Like in *Kirkpatrick*, the leases here explicitly stated in at least two places that the square footage of the leased premises was an approximation. Therefore, we find that the fact that the actual measurements differed from the approximations does not permit All American to pay a lesser amount of rent, taxes, or CAM charges.

¶ 68                              C. *Necessity of Paying Taxes and CAM Charges*

¶ 69    All American also claims that it should not have been required to pay taxes or CAM charges prior to 2008, meaning that it overpaid the amount due when it paid those charges. Article 5 of the 565 lease concerned the payment of taxes:

> "Commencing on the Commencement Date TENANT shall pay, as additional rent, TENANT'S proportionate share of all real estate taxes and assessments*** for each calendar year during the term hereof[.] *** For purposes of this Lease, TENANT'S proportionate share shall be deemed 1.50%. (2500 out of 167,142 sq. ft.)
>
> During the term of this Lease, TENANT shall pay to LANDLORD, monthly in advance, an amount equal to one-twelfth (1/12th) of TENANT'S proportionate share of real estate taxes and assessments for the current year, as reasonably estimated by LANDLORD. Such amount is currently estimated to be $2.00 per square foot. If TENANT'S proportionate share of taxes with respect of any tax year is less than the total amount theretofore paid by TENANT for such period, the excess shall be credited against the rent next becoming due or promptly refunded if no rent remains due. If TENANT'S proportionate share of taxes for any year promptly exceeds the total amount theretofore paid by TENANT for such period, TENANT shall, within 30 days after receipt of invoices from LANDLORD and a copy of real estate tax bill, pay the difference between the actual amount paid by TENANT and TENANT'S proportionate share of real estate taxes and assessments."

Article 5 of the 601 lease is identical except that the 601 lease deemed All American's proportionate share of taxes to be 4.49%. Article 6 of the leases provided that "the additional rent for real estate taxes and CAM shall not exceed $3.00 per square foot. Tenant shall not be responsible for payment of any real estate taxes or CAM, incurred or paid prior to December 1, 2006. CAM and Taxes shall be capped at $3.00 per foot during the original lease term." Article 6 further provided:

"During the 60-day period immediately following Landlord's delivery of any annual statement to taxes or CAM Charges, Tenant shall have the right to inspect Landlord's accounting records relating to Taxes of CAM Charges (as applicable to the statement delivered) at Landlord's or its agent's office, upon reasonable prior notice. Unless Tenant shall take written exception to any item in any such statement within said 60-day period, such statement shall be considered final and accepted by Tenant. Any payment due to Landlord or credit or payment due to Tenant as shown on any such statement shall be paid or applied in the manner and within the time period described herein, whether or not written exception is taken thereto, provided that such payment or application shall be without prejudice to any such written exception."

¶ 70    All American reads the provisions concerning taxes and CAM charges to say that there should be no monthly payment of taxes until 2008, since 2007 taxes were paid in 2008, and no CAM charges until All American was furnished with a statement of the 2007 annual CAM charges in 2008. With respect to the tax payments, the language of article 5 of the leases provides that "[d]uring the term of this Lease, TENANT shall pay to LANDLORD, monthly in advance, an amount equal to one-twelfth (1/12th) of TENANT'S proportionate share of real estate taxes and assessments for the current year, as reasonably estimated by LANDLORD." Thus, the clear and unambiguous language of the leases required All American to pay the taxes monthly in advance to Palatine Associates. All American attempts to read the second-to-last sentence of article 6, which reads, "Tenant shall not be responsible for payment of any real estate taxes or CAM, incurred or paid prior to December 1, 2006," to mean that since taxes are paid in 2008, there could be no tax payments due until 2008. We disagree. Even if the 2007 taxes are ultimately paid in 2008, they are nevertheless incurred in 2007. Given that the leases unambiguously contemplate advance payments, it is clear that All American was required to make tax payments beginning in 2007 and All American's argument to the contrary is not persuasive.

¶ 71    With regard to the CAM charges, the leases do not make clear whether CAM charges are also due monthly in advance or are paid in some other form. However, the leases do contemplate a credit being due to All American upon its review of an annual statement of CAM charges. If a credit is possible, there must have been contemplated some advance payment; otherwise, the amount due by All American would be exactly the amount stated in the annual statement and no credit would be possible. Thus, we agree with Palatine Associates that CAM charges are also paid in advance. Moreover, even if All American was in fact not required to pay CAM charges upon the furnishing of an annual statement that was never received, any overpayment of CAM charges would not have offset the amount owed by All American in rent and taxes. Thus, even if the amount due was overstated, there would still have been a balance owing at the time of the five-day notices and the leases would still have been terminated. See *Elizondo v. Medina*, 100 Ill. App. 3d 718, 721 (1981) (finding it irrelevant that the five-day notice demanded more money that was owed, since the tenant did not tender even the amount actually due).

¶ 72          D. *Palatine Associates' Acceptance of Lesser Amount of Rent*

¶ 73          All American also argues that Palatine Associates should be estopped from demanding strict compliance with the leases due to its conduct. All American claims that in May or June 2007, Palatine Associates and All American met to discuss the condemnation case and the condition of the shopping center. According to All American:

> "The parties agreed that due to the deteriorated condition of the common areas and the pending condemnation case, All American was unable to operate properly or sublease the premises, and it would be very difficult for Palatine Associates to find a new tenant willing to pay the amount of rent required under the Leases. Therefore, Palatine Associates agreed that All American was not obligated to pay the monthly rent in strict compliance with the terms of the Leases, but that Palatine Associates would be paid whatever amount All American could pay based on its business income during the pendency of the condemnation proceeding. The parties also agreed that Palatine Associates would be paid the full rent owed under the Leases out of the proceeds of any award granted to All American pursuant to the condemnation proceedings."

All American claims that based on this agreement, it submitted two $4,000 payments to Palatine Associates in October and December 2007. Thus, it argues that Palatine Associates should be estopped from demanding strict compliance with the leases. "The acceptance of rent, even after a notice to quit has been given, is not itself a waiver, but merely evidence to be considered in accordance with all the circumstances." *Wang v. Marcus Brush Co.*, 354 Ill. App. 3d 968, 970 (2005) (citing *Glad-Nan Corp. v. Henry's Drive-In, Inc.*, 29 Ill. App. 2d 363, 367 (1961), and *Podbielniak v. Podbielniak*, 38 Ill. App. 2d 451, 460 (1962)). In the case at bar, we find All American's argument to be unpersuasive for a number of reasons.

¶ 74          First, there is absolutely no evidence in the record to support that such a conversation occurred; All American's citation to the record in support of this alleged agreement is to its response to Palatine Associates' motion to determine that All American did not have an interest in the condemnation award. While All American is not required to prove its case on a motion for summary judgment, it must still present some factual basis that would support its claim. See *Schrager*, 328 Ill. App. 3d at 708. Here, there is no factual basis to support its contention.

¶ 75          But most importantly, article 26 of the leases explicitly state that "[n]o payment by Tenant or receipt by Landlord of a lesser amount than the rental or other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated rent *** and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or other charges or pursue any other remedy provided for in this Lease or available at law or in equity." Thus, the clear language of the leases indicates that acceptance of the checks, which constituted less than the total amount owed by All American, did not operate as a waiver of Palatine Associates' demand for strict compliance and that the money would be considered to be payment of the "earliest stipulated rent," in this case, rent from May or June 2007, which was when All American ceased paying rent. See *LaSalle National Bank v. First City Corp.*, 58 Ill. App. 3d 575, 578 (1978) ("Acceptance of rent which accrued prior to the breach constituting the ground for termination is not a

waiver of the right to enforce the forfeiture.").

¶ 76    We find All American's reliance on *McGill v. Wire Sales Co.*, 175 Ill. App. 3d 56 (1988), and *Waukegan Times Theatre Corp. v. Conrad*, 324 Ill. App. 622 (1945), to be unpersuasive. In *McGill*, the tenants paid, and the landlord accepted, a payment for all of the back rent due. *McGill*, 175 Ill. App. 3d at 58-59. This differs from the case at bar, where All American tendered a partial payment. Additionally, in *Waukegan Times*, the landlord knew that prohibited assignments of the lease had occurred but did not complain of the assignments and continued to collect rent from the assignees for over a year. *Waukegan Times*, 324 Ill. App. at 631-32. Here, by contrast, Palatine Associates did not continue to behave as though strict compliance with the leases was not necessary. Palatine Associates served five-day notices in August 2007, filed actions for forcible entry and detainer shortly thereafter, and continued to pursue those actions until the eviction court dismissed them as moot in January 2010. Thus, we cannot find that Palatine Associates' conduct prevents them from arguing that All American was required to comply with the leases.

¶ 77                         E. *Representations by Palatine Associates*

¶ 78    All American also argues that Palatine Associates is estopped from arguing that All American breached the leases because Palatine Associates breached the leases and their oral representations to All American by failing to make repairs to the common areas of the shopping center. All American characterizes its claims in this area as fraudulent inducement claims.

¶ 79    Article 26 of the lease provides:

"(f) Entire Agreement. This Lease and exhibits attached hereto set forth all of the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as otherwise provided no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

This Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, lease proposals, brochures, representations, and information conveyed, whether oral or in writing, between the parties hereto or their respective representatives or any other person purporting to represent the Landlord or the Tenant. The Tenant acknowledges that it has not been induced to enter into this Lease by any representations not set forth in this Lease, shall be used in the interpretation or construction of this Lease, and the Landlord shall have no liability for any consequences arising as a result of any such representations."

¶ 80    Palatine Associates claims that the presence of the integration and nonreliance clauses in article 26 of the leases precludes All American's arguments as a matter of law. We agree that the nonreliance clause prevents All American from establishing justifiable reliance on any alleged statements made by Palatine Associates prior to entering into the leases. To state a claim for fraud, a plaintiff must allege five elements: "(1) a false statement of material fact;

-21-

(2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 592 (1994) (citing *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980)). As part of its fraud claim, a plaintiff must allege that its reliance on the misrepresentation was justified. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125 (1995). "In determining whether reliance was justifiable, all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence, are taken into account." *Adler*, 271 Ill. App. 3d at 125.

¶ 81    One factor that courts have considered in analyzing justifiable reliance is the presence of a nonreliance clause in a contract between the parties. See *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 457 (2004); *Adler*, 271 Ill. App. 3d at 126; *Rissman v. Rissman*, 213 F.3d 381, 383-85 (7th Cir. 2000). In the case at bar, All American claims that the nonreliance clause in the leases should instead be considered an exculpatory clause and therefore did not prevent its claim. We disagree.

¶ 82    In support of its argument, All American cites *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 285 Ill. App. 3d 201, 216 (1996), in which the court found that a clause limiting liability for fraud did not prevent rescission of the contract because "exculpatory clauses for wilful and wanton conduct are void as a matter of public policy," which included the provision that limited the liability for fraud. We find our decision in *Benson v. Stafford*, 407 Ill. App. 3d 902 (2010), to be instructive. In that case, we also considered whether a clause was a nonreliance clause or an exculpatory clause, and also considered the plaintiff's reliance on *Kleinwort*. In determining that it was not an exculpatory clause, we noted:

> "The provision indicates that no party relied on any representation that was not contained in the written contract. If there was no reliance, then there can be no liability, regardless of whether the last sentence of the provision is present. The language of the provision merely makes explicit an already-present result of the nonreliance clause. We do not see it as analogous to *Kleinwort*, because in that case, the clause limited the remedy for an intentional tort that had occurred. See *Kleinwort*, 285 Ill. App. 3d at 215. Here, the fraud *cannot* occur, because the parties have agreed that there was no reliance, a necessary element for fraud. Thus, the clause targets reliance, not a release from liability for intentional torts, which would be void. See *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 164 (1986) ('An exculpatory clause cannot protect persons from the results of their wilful and wanton misconduct.')." (Emphasis in original.) *Benson*, 407 Ill. App. 3d at 926-27.

Similarly, in the case at bar, the parties have agreed that no promises were made outside of the language of the leases and that All American was not induced to enter into the leases. This targets the reliance element of fraud and the presence of the liability clause at the end of the lease provision does not turn that into an impermissible exculpatory clause. Thus, All American cannot claim that its leases were not terminated because of fraud committed by Palatine Associates.

¶ 83                                    F. *Palatine Associates' Breach*

¶ 84        Finally, All American argues that the breaches of the leases committed by Palatine Associates in not making the repairs it was required to make under the lease allowed All American to offset its damages against the rent due, again eliminating any rent due at the time of the five-day notices. Exhibit B of the leases, entitled "Landlord's Work," provides in entirety: "Landlord shall not perform any work whatsoever on the Premises. Tenant shall accept the Premises 'AS IS, WHERE IS AND WITH ALL FAULTS, IF ANY.' Landlord shall be responsible for the maintenance and replacement as needed of all Mechanical (HVAC), electrical systems, any fire sprinkler systems and other structural components."

¶ 85        Article 12 of the leases also provided the following concerning repairs by Palatine Associates:

> "Landlord, shall keep the foundations, roof, parking areas, Common Areas and structural portions of the walls of the Premises in good condition and repair, except for repairs required thereto by reason of the acts or omissions of Tenant, Tenant's employees, agents, invitees, licensees, or contractors. Tenant shall reimburse Landlord for such repairs, replacement and maintenance as described in Article 6 of this Lease provided in no event shall Tenant be responsible for any repair or replacement costs for the foundations, structural portions of the walls, load bearing items, plumbing, utility lines, pipes and conduits inside or outside the Premises and/or common areas unless the repair or replacement is caused by Tenant, its employees, customers or invitees. Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs. The provisions of this Paragraph shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which event the obligations of Landlord shall be controlled by either Article 14 or Article 16 hereof. If [Landlord] fails to make the required repairs under the lease within a reasonable time, then Tenant may make said repairs and offset against rent."

¶ 86        Article 24 of the leases concerns breach of the leases by Palatine Associates:

> "If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center as the same may then be encumbered and neither Landlord nor if Landlord be a partnership, any of the partners comprising such partnership shall be liable for any deficiency. Tenant may also offset its judgment against rents."

All American's argument is not persuasive concerning offsetting Palatine Associates' claimed breaches against All American's rent due because All American did not satisfy either of the two ways in which it was entitled to offset rent under the leases. The first way, under article 12, required All American to give written notice of any repairs that needed to be made and then, after Palatine Associates failed to make the repairs, All American could make them and offset it against the rent. The second way, under article 24, required All American to

recover a money judgment against Palatine Associates. There is no evidence in the record of All American requesting or making any repairs to the property, and there is no question that All American never received a money judgment against Palatine Associates. Accordingly, All American was not entitled to offset anything against the amount of rent due.

¶ 87　　Even if Palatine Associates had breached the leases, the mere fact that it did so did not relieve All American of its obligations to pay rent. "Even if a lessor agrees to repair, *** that covenant is independent of the lessee's duty to pay rent." *City of Chicago v. American National Bank*, 86 Ill. App. 3d 960, 963 (1980) (citing *McArdle v. Courson*, 82 Ill. App. 3d 123, 125-26 (1980)). Thus, All American was still required to pay rent under the leases. Since none of All American's defenses established that the five-day notices were ineffective, we find that the five-day notices terminated the leases and, consequently, All American was not entitled to a portion of the award of just compensation.

¶ 88　　　　　　　　　　　　　　　　IV. Escrow

¶ 89　　Since we have determined that All American is not entitled to any part of the final award for just compensation, we need not determine whether the condemnation court erred in permitting disbursement of the award by the escrowee.

¶ 90　　　　　　　　　　　　　　　　CONCLUSION

¶ 91　　For the reasons set forth above, the condemnation court correctly determined that All American was not entitled to share in the final award of just compensation.

¶ 92　　Affirmed.