# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938

| | |
|---|---|
| Appellate Court Caption | HOWARD FREEDBERG, Plaintiff-Appellant, v. OHIO NATIONAL INSURANCE COMPANY and DENNIS W. McCABE, d/b/a D.W. McCabe and Associcates, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-0938 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | June 22, 2012<br><br>July 24, 2012<br>August 3, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff failed to present a factual basis to prevent the entry of summary judgment for defendants in his action seeking rescission of his purchase of a life insurance policy and alleging violations of the Consumer Fraud Act, and he was properly denied leave to file an amended complaint for fraud. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-37687; the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Robert J. Slobig and James K. Genden, both of Torshen, Slobig, Genden, Dragutinovich & Axel, Ltd., of Chicago, for appellant.

Kevin M. O'Hagan, Daniel J. Nolan, and Edward C. Eberspacher IV, all of O'Hagan Spencer LLC, of Chicago, for appellees.

Panel     PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices McBride and Howse concurred in the judgment, and opinion.

## OPINION

¶ 1     Plaintiff, Dr. Howard Freedberg, purchased a life insurance policy from defendants, the Ohio National Insurance Company (Ohio National) and Dennis W. McCabe, d/b/a D.W. McCabe and Associates (McCabe), in December 2004. Plaintiff filed the instant case on December 20, 2007, alleging that McCabe's misrepresentations induced him to purchase the policy. Plaintiff now appeals from: (1) the circuit court's November 24, 2010, order granting summary judgment in favor of defendants on both counts of plaintiff's verified complaint (for rescission and violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2006))); and (2) the circuit court's February 17, 2011 order denying plaintiff's motion to file a verified amended complaint (for fraud). For the following reasons, we affirm.

¶ 2                 BACKGROUND

¶ 3     In the fall of 2004, plaintiff sought financial advice from his sister, Lori Komisar, who has a business degree from the University of Illinois and had worked as a trader for a large New York firm. Plaintiff was under a court order, entered in his divorce case, to maintain a certain level of insurance for his five children. He relied on his sister because he had "zero financial background."

¶ 4     Komisar referred plaintiff to McCabe, an agent of Ohio National. Plaintiff first spoke to McCabe in the fall of 2004. Plaintiff and McCabe also met several times and discussed plaintiff's goals. McCabe sold plaintiff the life insurance required by the divorce settlement and order. In addition to protecting his children, plaintiff also wanted to protect his assets from potential creditors and to pay off the mortgage on his residence. Plaintiff requested that McCabe review plaintiff's other life insurance policies that he owned at the time (with First Colony and Sun Life). Plaintiff did not inform McCabe that, at the time, plaintiff had a pending lawsuit against him by a former business partner. McCabe suggested a whole life policy and showed plaintiff other options.

¶ 5    On October 11, 2004, McCabe sent plaintiff the term life insurance policy he had purchased to satisfy the divorce settlement agreement and order, as well as an application for a new policy based on his initial review of plaintiff's policies with the other companies. Thereafter, Komisar advised McCabe that his banker had recommended plaintiff purchase a $1 million annuity.

¶ 6    On November 11, 2004, McCabe sent a letter to Komisar showing her two options for plaintiff with summaries of each. Option I was life insurance with a discounted premium. Option II was a single premium deferred annuity. In his letter, McCabe explained that in both cases they were "not subject to creditors."

¶ 7    On December 1, 2004, plaintiff met with McCabe in person for the first time. McCabe's affidavit states that the meeting occurred at Fingerweights Corporation in Wheeling and that Komisar was also present. During his deposition, plaintiff testified that he had no independent recollection of how many meetings he had with McCabe in 2004 and believed there were three or four meetings. Plaintiff could not recall the specifics of any of the meetings. He could recall that McCabe told him he could take money out of the policy to pay off his house and that there would be no problems, penalties or repercussions. Plaintiff signed an application for the whole life insurance policy that he eventually purchased (the Policy). Plaintiff did not choose either of the two options that had been presented but, instead, chose a whole life policy that had the same $4.5 million death benefit but had a lower premium than the $256,000 annual premium illustrated with Option I. Plaintiff's monthly payments were $18,000 for an annual premium of $216,000.

¶ 8    In a letter dated December 2, 2004, McCabe documented plaintiff's decision and also advised plaintiff that, based on the $18,000 monthly premium, the cash value at age 65 would be over $1.2 million (plaintiff was 49 at the time). According to the affidavit of Ray Spears, the second vice president of underwriting at Ohio National, he received plaintiff's application on December 2, 2004.

¶ 9    In December 2004, plaintiff discussed his purchase of the policy with his financial advisor, Jarvis Friduss, a certified public accountant. Friduss was not familiar with Ohio National and referred plaintiff to Steve Braun, an agent for Northwestern Mutual Life Insurance Company. On December 8, 2004, Braun faxed plaintiff: (1) information on how cash value is exempt from creditors in Illinois; (2) a company comparison of Northwestern Mutual and Ohio National; and (3) an illustration showing premiums of $18,000 per month for 4 years. Braun also told plaintiff that he "would be curious to see an illustration from Ohio National." Plaintiff ultimately did not purchase a policy from Northwestern Mutual.

¶ 10    Meanwhile, Ohio National processed plaintiff's application. As part of the process, Ohio National created a policy delivery receipt on or about December 8, 2004. On December 8, 2004, Ohio National sent, via Federal Express, the original policy and a policy acknowledgment receipt to Dennis McCabe. According to Spears's affidavit, McCabe received the original policy and the policy acknowledgment receipt on December 9, 2004. The Policy was issued by Ohio National with a face amount of $4,500,000.

¶ 11    In his deposition, McCabe testified that he met with plaintiff, plaintiff's estate-planning attorney John Worthen, and Komisar on February 10, 2005, in plaintiff's office. He testified

that he reviewed the Policy with plaintiff and Komisar before John Worthen arrived. He also testified that he provided the Policy to plaintiff along with the delivery receipt. Plaintiff signed the delivery receipt and the body of the document refers to the Policy. The delivery receipt is dated February 10, 2005.

¶ 12     In late 2005, the lawsuit filed against plaintiff by his former business partner went to trial. On January 27, 2006, judgment was entered against plaintiff in the amount of $422,400. In January 2006, plaintiff had a meeting with Friduss and the two discussed the Policy. Plaintiff testified in his deposition that he "probably went home and tried to find the policy for [Friduss] and could not find the policy." Plaintiff also testified that Friduss "probably had asked [him] at that point to obtain a copy of the policy." Plaintiff conceded that he did not "recall if he explicitly had asked [him] and that he did not have "100 percent independent recollection to those facts." In his deposition, Friduss acknowledged that he spoke to McCabe in January 2006, but had "no independent memory" of the conversation.

¶ 13     On February 22, 2006, plaintiff, Friduss, McCabe, and Worthen met in Friduss's office. During the meeting, McCabe first learned of the lawsuit and the judgment against plaintiff. McCabe testified in his deposition that it was his understanding that the purpose of the meeting was to review plaintiff's estate plan and that there were questions regarding whether plaintiff could afford his insurance premiums. McCabe also stated that there was a discussion regarding taking the cash value out of the Policy and the interest rate. McCabe stated that plaintiff was upset and stated it was the first time he had heard of loan interest on the Policy.

¶ 14     Friduss testified in his deposition that he had no independent recollection of ever seeing the Policy, but if he did it would probably have been in February 2006 at the meeting with McCabe. In his deposition, plaintiff was asked if he "reviewed the policy with [Friduss] sometime in March 2006," and plaintiff responded, "[a]t some point I did, yes." In his verified complaint, plaintiff states "[i]n about March 2006, [plaintiff] finally obtained a copy of the [Policy.]" According to plaintiff's verified complaint, after he reviewed the Policy, "[i]t became apparent to [plaintiff and Friduss], that the [P]olicy did not have any provision that would permit [plaintiff] to withdraw cash value from the [P]olicy without penalties or charges, and [that plaintiff] had not been given any discount from the regular premium for such policies."

¶ 15     During his deposition, Friduss also discussed email communications between McCabe and himself in March and April 2006 regarding the purported 20% discount plaintiff had received when he obtained the Policy. Specifically, Friduss asked McCabe if that discount would be lost if the premium payments were reduced. Friduss noted that at no time did McCabe say that the 20% discount did not exist and that, instead, McCabe responded that he would call Ohio National to see how the request to reduce premiums while maintaining the discount would be accomplished.

¶ 16     On October 25, 2006, plaintiff, through his attorneys, sent a written demand to Ohio National for rescission of the Policy and demanded return of all premiums. At the same time that plaintiff sent the demand for rescission to Ohio National, he was in the process of taking steps to replace the Policy with a similar policy from Northwestern Mutual. By letter dated November 30, 2006, Ohio National refused to rescind the policy or return the premiums. Its

decision was based, in part, on plaintiff's application for a replacement policy. Ohio National noted that the premium for this replacement policy was near the minimum premium required to support a $4.5 million death benefit and that the replacement policy provided little or no ability to generate cash value, which was a stated goal of plaintiff's when he applied for the Policy on December 1, 2004. Ohio National also stated that it hoped to retain plaintiff as a valued customer.

¶ 17      The parties apparently tried to resolve the situation. During this time, Ohio National continued to automatically withdraw the $18,000 premium from plaintiff's checking account. According to an affidavit of Robert J. Slobig, one of plaintiff's attorneys, he sent a letter to Ohio National on September 12, 2007, advising it that plaintiff had taken steps to stop the automatic payment because it was inconsistent with his desire to obtain rescission. Ohio National then began collecting the $18,000 monthly premium by means of an "Automatic Premium Loan" as allowed per the Policy.

¶ 18      According to Slobig's affidavit, by letter dated November 21, 2007, Ohio National rejected plaintiff's demand for rescission and a refund of his premiums. On December 20, 2007, plaintiff filed a two-count verified complaint for rescission and violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 *et seq.* (West 2006)).

¶ 19      On or about February 1, 2008, plaintiff filed a motion for temporary relief to preserve the status quo, requesting a temporary order restraining and enjoining Ohio National from charging premiums, interest, loans or other amounts against the Policy, but allowing him to maintain the Policy's benefits. On February 4, 2008, the circuit court denied plaintiff's motion. Plaintiff surrendered the policy on February 19, 2008. Plaintiff also applied for, and obtained, two term life insurance policies.

¶ 20      On June 16, 2010, defendants filed a motion for summary judgment. On November 12, 2010, before the trial court ruled on defendants' motion for summary judgment, plaintiff filed a motion for leave to file a verified amended complaint. The proposed amended complaint added claims for common law fraud, negligence, and negligent misrepresentation.

¶ 21      On November 24, 2010, the circuit court granted summary judgment in favor of defendants on both counts of plaintiff's verified complaint. On February 17, 2011, the circuit court denied plaintiff's motion to file a verified amended complaint. Plaintiff now appeals both orders.

¶ 22                              ANALYSIS
¶ 23                    Motion for Summary Judgment
¶ 24      Plaintiff first argues that the trial court erred in granting summary judgment. He contends that there were disputed issues of fact as to both counts of his verified complaint (for rescission and violations of the Consumer Fraud and Deceptive Business Practices Act).

¶ 25      We review the trial court's decision to grant summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). " 'Summary judgment is a drastic measure and should only be granted if the movant's right to judgment

is clear and free from doubt.' " *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 42 (quoting *Outboard Marine Corp.*, 154 Ill. 2d at 102). Nonetheless, mere speculation or conjecture is insufficient to avoid summary judgment. *Id.*; see also *Miller v. Hecox*, 2012 IL App (2d) 110546, ¶ 42. A defendant moving for summary judgment may meet its initial burden of proof by affirmatively showing that some element of the case must be resolved in his favor or by establishing that there is an absence of evidence to support the nonmoving party's case. *Village of Palatine*, 2012 IL App (1st) 102707, ¶ 42.

¶ 26     "The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists. [Citation.] To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim. [Citation.] We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct." (Internal quotation marks omitted.) *Id.* ¶ 43.

¶ 27     "Rescission is the cancelling of a contract so as to restore the parties to their initial status. [Citation.]" (Internal quotation marks omitted.) *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 165 (2004). "One seeking to rescind a transaction on the ground of fraud or misrepresentation must elect to do so promptly after learning of the fraud or misrepresentation, must announce his purpose and must adhere to it." *Mollihan v. Stephany*, 35 Ill. App. 3d 101, 103 (1975). "An unreasonable delay in taking the necessary steps to set aside a fraudulent contract will have the effect of affirming it." *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 165.

¶ 28     In the instant case, the trial court concluded that plaintiff's unreasonable delay on seeking rescission resulted in ratification of the Policy. We agree.

¶ 29     Although not controlling, we find instructive the case of *McNaught v. Equitable Life Assurance Society of the United States*, 121 N.Y.S. 447 (N.Y. App. Div. 1910), cited by defendants and the trial court. *McNaught* also involved plaintiffs seeking to rescind a life insurance policy and alleging he was fraudulently induced into purchasing it. After bringing suit, the plaintiffs continued to pay premiums and receive the policy's benefits and coverage. The *McNaught* court acknowledged that one who discovers he has been induced to enter into a contract by fraud may rescind the contract. *McNaught*, 121 N.Y.S. at 449. The court further noted, however, that rescission would not be available "if, after knowledge of the fraud, *he affirms the contract by accepting a benefit under it*." (Emphasis added.) *Id.* In denying the plaintiffs' claim for rescission and concluding that the plaintiffs had ratified the policy, the *McNaught* court noted that the plaintiffs conceded that "if the insured should die during the pendency of this action, and while the current premiums were being paid, the defendant would continue [to be] liable to the beneficiary of the policy for the full amount of insurance, notwithstanding the plaintiffs' election to rescind." *Id.* at 451. The court further noted that "[i]n the same breath," the plaintiffs acknowledged that if a judgment for rescission was obtained before the death of the insured, they would be entitled to recover all of the premiums paid both before and after bringing suit. *Id.* As the court explained:

"If this can be so, then a novel situation, indeed, exists, and one which is unsupported either by precedent or reason. The equitable action for a rescission cannot be considered

-6-

as a speculation. And if it could be, it should not be assimilated to the tossing of a coin on the principle of: 'Heads, I win; tails, you lose.' " *Id.*

The trial court here concluded that plaintiff displayed the same type of "heads I win, tails you lose" attitude which is inconsistent with a sincere desire to rescind the Policy.

¶ 30    Plaintiff did not promptly demand rescission nor did he adhere to his purpose. Regarding plaintiff's delay in seeking rescission, plaintiff claims he did not receive a copy of the policy in February 2005. He asserts that "[on] some date, which [plaintiff] does not know, McCabe induced him to sign a delivery receipt for the Ohio National policy. The handwritten date on the form is not [plaintiff's] handwriting, although the signature is." Although plaintiff claims he did not receive the Policy in February 2005, which was the date listed next to his signature on the delivery receipt, he presented no evidence as to when he did sign the delivery receipt. In any event, in his verified complaint, plaintiff alleged that he had discussions about the policy with his accountant in January 2006. His accountant asked him various questions and, since plaintiff did not have a copy of the Policy, he requested a copy from McCabe. Plaintiff states that "[i]n about March 2006, [plaintiff] finally obtained a copy of the [Policy]." He also states that he became aware of the alleged misrepresentations "upon review of the actual [Policy] in 2006." When asked in his deposition whether he reviewed the policy with his accountant in March 2006, plaintiff responded, "At some point, I did." He now contends that this statement does not unequivocally mean that he reviewed the policy in March 2006, but presents no facts as to when he did review the policy or learn of the alleged fraud. Plaintiff also now claims that he did not receive a copy of the Policy until after September 2006, when he received a duplicate copy from Ohio National. This was the only duplicate copy sent by Ohio National. Thus, Ohio National notes that "the only policy that plaintiff could have possessed at any time prior to September 6, 2006 was the original policy" that it sent to McCabe in December 2004. Nonetheless, plaintiff asserts that his written demand for rescission, on October 25, 2006, was prompt.

¶ 31    The trial court noted correctly that plaintiff made judicial admissions which cannot be contradicted. As the Illinois Supreme Court has explained:

> "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge. [Citation.] Where made, a judicial admission may not be contradicted in a motion for summary judgment [citation] or at trial [citation]. The purpose of the rule is to remove the temptation to commit perjury. [Citation.]" *In re Estate of Rennick*, 181 Ill. 2d 395, 406-07 (1998).

"A factual admission in a verified pleading constitutes a judicial admission, which has the effect of withdrawing a fact from issue and makes it unnecessary for the opposing party to introduce evidence in support thereof. [Citation.]" *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2011 IL App (1st) 102379, ¶ 35. "A sworn statement of fact in a verified pleading remains binding on the party even after an amendment, and the party cannot subsequently contradict the factual allegation." *Id.* Moreover, even pleadings that are not verified may be used as evidentiary admissions. *National Surety Corp. v. Swissler Plumbing, Inc.*, 167 Ill. App. 3d 608, 616 (1988).

¶ 32    The trial court acknowledged that plaintiff contended that the reason for the delay in

filing suit was that he was attempting to settle the matter with Ohio National. However, as the trial court noted, these settlement negotiations did not commence until May 11, 2007, when plaintiff's attorney contacted Ohio National and threatened to file suit, which was 14 months after March 2006, the date plaintiff learned of the alleged fraud, and 6 months after Ohio National denied his demand for rescission. Ohio National denied his demand for rescission on November 30, 2006, yet plaintiff did not file this action seeking rescission until December 20, 2007.

¶ 33     Thus, there was a delay of seven months between the time plaintiff admitted he received a copy of the Policy and his initial demand for rescission. Plaintiff then delayed 14 months before filing his court action for rescission. He continued to make premium payments of $18,000 per month until September 2007 when he cancelled the automatic payment instruction which allowed Ohio National to withdraw the premiums from his checking account. These delays and premium payments, while receiving the benefits of the Policy, constitute a ratification of the Policy.

¶ 34     Moreover, plaintiff did not adhere to his purpose. Even after he filed this action, plaintiff filed the petition for a temporary restraining order in February 2008 seeking an order that would allow him to maintain the policy benefits without having to pay the premiums throughout the course of the litigation. The trial court concluded that plaintiff's "heads I win, tails you lose" attitude continued from the time he first learned of the alleged fraud in March 2006, throughout the negotiations with Ohio National, until the court denied his petition for a temporary restraining order in 2008.

¶ 35     Although plaintiff's ratification of the policy renders moot his claims of fraud, we note that the record is replete with responses from plaintiff as to his "beliefs" and his lack of recollection as to numerous statements, transactions, or events. Also, as the trial court noted, plaintiff's allegation of fraud regarding *delivery* of the Policy was pure conjecture. When asked in a supplementary interrogatory to identify documents which he signed in the course of his dealings with McCabe and to explain the circumstances surrounding the signing of the documents, plaintiff answered that he "*believes* he signed his name to a receipt for the delivery of the subject Ohio National insurance policy, No. 1544255, without having received the policy, and without being advised what he was signing, at a meeting with Dennis McCabe." (Emphasis added.) Moreover, although the claims of fraud are moot, we note that, with the exception of plaintiff's claims that he did not receive the discount on his premium that he was told he would receive, the remaining allegations of fraud (*i.e.*, that he could withdraw funds from the Policy's cash value without paying "interest" and that McCabe told plaintiff the Policy would accumulate at least $1 million in cash value within five years) were based on surmise and conjecture and plaintiff failed to present any evidence sufficient to withstand summary judgment.

¶ 36     To prevail on a claim of fraudulent misrepresentation, a plaintiff must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. *Doe v. Dilling*, 228 Ill. 2d 324, 342-43 (2008). "The elements of a claim under the Consumer Fraud Act are: '(1) a deceptive act or practice by the defendant; (2) the

defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce.' [Citation.]" *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 62.

¶ 37    As the trial court noted, when plaintiff was asked at his deposition about the alleged misrepresentations made by McCabe, plaintiff testified as follows:

"[DEFENDANTS' ATTORNEY]: If you would turn to paragraph nine of your complaint. The second sentence says, 'Mr. McCabe further represented to Dr. Freedberg that Dr. Freedberg would then be able to withdraw this cash value enough to pay off Dr. Freedberg's home mortgage from the proposed Ohio National policy without penalty, interest, or other charges, and use it to pay off the mortgage.'

Is it fair to say that that is not word for word what Mr. McCabe said to you?

[PLAINTIFF]: I don't recall exactly word for word, but I think it does–it's accurate in regards to what was told to me. There was [*sic*] no penalties. And I was able to take it out. I was not borrowing it out. I could take it out.

[DEFENDANTS' ATTORNEY]: As close to word for word, what did Dennis McCabe tell you relating to taking money out of the policy?

[PLAINTIFF]: Over four years later, I can't give you word for word. I can tell you that I can take the money out. I recall those words. Was [*sic*] there any problems? No. Was [*sic*] there any penalties? No.

[DEFENDANTS' ATTORNEY]: Did Mr. McCabe tell you that you could take money out that you didn't have to pay back?

[PLAINTIFF]: I don't–I recall that there was [*sic*] no repercussions for doing that. That's why I did this policy.

[DEFENDANTS' ATTORNEY]: What did Mr. McCabe specifically state that leads you to believe that he said there were no repercussions?

[PLAINTIFF]: I asked him several times.

[DEFENDANTS' ATTORNEY]: What did you ask him?

[PLAINTIFF]: I said, I can just take the money out and pay off my house and nothing else needs to be done? No. There's [*sic*] no repercussions? No. There is [*sic*] no penalties. No.

[DEFENDANTS' ATTORNEY]: Mr. McCabe said, There is [*sic*] no repercussions?

[PLAINTIFF]: Well, I can't remember the exact verbiage. I'm telling you what I remember as the–not the exact words, but what was said, the context of it.

[DEFENDANTS' ATTORNEY]: Did you ask Mr. McCabe if the money you took out would be a loan?

[PLAINTIFF]: I didn't ask if it was a loan. I just asked if I could take it out and there is [*sic*] no problems. No problems.

[DEFENDANTS' ATTORNEY]: Did Mr. McCabe tell you that after five years you could withdraw $1 million tax free?

[PLAINTIFF]: Yes. Well, I'm–I don't remember, you know, the words tax free. But

-9-

it was my money paid in. So I could take it out. I don't remember anything being told if there were any tax consequences of it either."

¶ 38 Contrary to plaintiff's assertions, the trial court did not "weigh" the witnesses' credibility but instead determined that plaintiff "has not produced any evidence to support his allegation that McCabe misrepresented any material facts to Freedberg, or that Freedberg reasonably relied on any misrepresentation, material or otherwise, or that McCabe intended Freedberg to rely on any misrepresentation that he made." As noted earlier, at the summary judgment stage, a plaintiff must present some factual basis that would support his claim. *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 43. We conclude that the trial court correctly granted summary judgment to defendants.

¶ 39                                    Motion to Amend

¶ 40 Plaintiff next argues that the trial court should have granted him leave to file a verified amended complaint. We review the trial court's decision to deny leave to file an amended complaint under an abuse of discretion standard. *Cimco Communications, Inc. v. National Fire Insurance Co. of Hartford*, 407 Ill. App. 3d 32, 38 (2011).

¶ 41 Plaintiff correctly notes that amendments may be allowed "on just and reasonable terms." Notwithstanding the general rule that amendments should be granted liberally, a party's right to amend is not absolute and unlimited. *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 113 (2011). As this court has explained:

"The decision whether to allow a party to amend its pleadings is within the sound discretion of the trial court; such a decision will not be disturbed without a showing of an abuse of that discretion. [Citation.] The right to amend pleadings is not absolute, and the timeliness of such a request may be considered by the court in its discretion. [Citation.] The court should exercise its power to permit amendment with a view toward allowing a party to present fully his causes of action. [Citation.] Ordinarily, amendment should not be allowed where the matters asserted were known by the moving party at the time the original pleading was drafted and for which no excuse is offered in explanation of the initial failure. [Citation.] The test to be applied in determining whether the trial court's discretion was properly exercised is whether allowance of the amendment furthers the ends of justice. [Citation.]" *Trans World Airlines, Inc. v. Martin Automatic, Inc.*, 215 Ill. App. 3d 622, 627-28 (1991).

¶ 42 Section 2-616(a) of the Code of Civil Procedure states:

"Amendments. (a) At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as plaintiff or defendant, dismissing any party, changing the cause of action or defense or adding new causes of action or defenses, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim." 735 ILCS 5/2-616(a) (West 2008).

Plaintiff now asserts that the trial court abused its discretion in not allowing him to add additional counts based on the same facts.

¶ 43    Since the issue of whether a trial court may deny a plaintiff leave to amend his pleadings is one which is properly addressed to the sound discretion of the trial court, "a reviewing court may intervene only where the trial court acted arbitrarily or, in light of all the circumstances presented, exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted [citation]; or where the judgment of the trial court is found to be palpably erroneous, contrary to the manifest weight of the evidence or manifestly unjust [citation]; or where no reasonable person could take the view adopted by the trial court." *Nicholson v. Chicago Bar Ass'n*, 233 Ill. App. 3d 1040, 1044-45 (1992). In denying plaintiff leave to amend his complaint, the trial court noted that the motion was very brief and did not provide the court with affirmative reasons for allowing the amendment. As the trial court also stated, it had "the discretion to dictate and enforce what it believe[d] to be just and reasonable terms." Citing *Nicholson*, the trial court noted that the phrase "just and reasonable terms" implies the existence of a "time limitation within which the amendment must be filed."

¶ 44    The trial court's decision denying plaintiff leave to amend his complaint must be viewed in the context of the present case. Plaintiff argues that the trial court's decision was, to a great extent, premised on the fact that it had granted defendants' motion for summary judgment. While that may be true, as defendants note, a motion to amend that is nothing more than an attempt to evade an unfavorable summary judgment outcome should not be granted. See, *e.g.*, *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 625-26 (7th Cir. 1987) (district court did not abuse its discretion in denying leave to amend where proposed amendment came after the close of discovery and defendants moved for summary judgment, because plaintiff's motion "represents an apparent attempt to avoid the effect of summary judgment" (internal quotation marks omitted)); *cf. United Air Lines, Inc. v. Conductron Corp.*, 69 Ill. App. 3d 847, 858 (1979) (trial court did not abuse its discretion in denying defendants leave to amend their answer to plead statute of limitations where motion was made after plaintiff's motion for summary judgment was presented and heard, and trial court stated that summary judgment would be entered for plaintiff and defendants gave no reason for the failure to plead the affirmative defense at an earlier time).

¶ 45    In determining whether to allow an amendment to the pleadings, the trial court considers the following factors: (1) whether the proposed amendment would cure a defect in the pleadings; (2) whether the proposed amendment would prejudice or surprise other parties; (3) whether the proposed amendment is timely; and (4) whether there were previous opportunities to amend the pleading. See, *e.g.*, *Krum v. Chicago National League Ball Club, Inc.*, 365 Ill. App. 3d 785, 790 (2006). The trial court here considered each factor and determined that none of them weighed in favor of plaintiff.

¶ 46    As to the first factor, citing *Tri-G, Inc. v. Burke, Bosselman, & Weaver*, 353 Ill. App. 3d 197, 215 (2004), plaintiff now argues that this factor was irrelevant because he was adding new causes of action. As defendants note, the Illinois Supreme Court reversed *Tri-G* without reviewing its "one-line 'failure to cure' " analysis. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218 (2006). Even assuming this factor was irrelevant, the trial court found the other three factors also weighed against plaintiff.

¶ 47    As to the second factor, plaintiff argues that the trial court stated only that there was a

"possibility" of prejudice and failed to explain why this was so. Plaintiff provides no support for his assertion that the trial court was required to explain the prejudice that would result. We also find defendants' citations to cases where a motion to amend was proposed "on the eve of trial" or "after trial has begun" inapposite. Nonetheless, in considering the possible prejudice to defendants, the trial court noted that the new claims carried substantially different elements and theories of law.

¶ 48   Regarding the third factor, the trial court found that plaintiff's motion to amend was not timely. We note that plaintiff has contended on appeal that the timeliness factor has no relevance because summary judgment was erroneously granted. On this point, plaintiff is clearly wrong. In any event, we have now affirmed the trial court's decision granting summary judgment.

¶ 49   Plaintiff has failed to adequately address the timeliness factor, other than to refer to it as a factor that courts "sometimes" consider and imply that it is an irrelevant factor where the trial court failed to "explain" how adding these new theories would have been prejudicial.

¶ 50   Plaintiff filed his original complaint on December 20, 2007; he filed his motion to amend on November 12, 2010 (which was the eve of the trial court's scheduled ruling on defendants' motion for summary judgment). As the trial court noted, plaintiff had over 2½ years from the time he filed his original complaint before the motion for summary judgment was heard. As defendants note, it was nearly three years later. The court also noted that plaintiff did not allege that he discovered new information during this period of time which required him to seek leave to amend his original complaint. Instead, plaintiff's decision was based on a desire to "introduce additional theories of relief" in order to increase his chances of recovery by creating "various available routes to the same goal." The trial court was not persuaded that this was a valid reason.

¶ 51   Additionally, however, the trial court explained that plaintiff's motion was untimely because, although summary judgment had not yet been entered at the time plaintiff sought leave to file an amended complaint, the motion for summary judgment had been filed, argument had been heard, and the court's ruling was scheduled. Although plaintiff's motion to amend his complaint was technically filed before the entry of summary judgment, plaintiff did not provide any explanation for filing the motion at such a late stage in the proceedings. The trial court considered that plaintiff was aware of the possibility that summary judgment could be entered, thus ending the case, while the motion to amend was pending. Relying on *Martin v. Yellow Cab Co.*, 208 Ill. App. 3d 572, 577 (1990), the trial court noted that this court has held that leave to amend a complaint is properly denied in circumstances where a plaintiff had ample time to discover any independent causes of action, where the proposed additional counts are based on facts available to the plaintiff when the original complaint was filed, and the motion to amend was filed 20 months after the complaint was filed, and more than 3 years after the accident in question, and defendant's motion for summary judgment was pending. The trial court ultimately decided that plaintiff's motion to amend was untimely because he waited nearly three years to file it, had no explanation for the time delay, and there was a ruling pending on the motion for summary judgment.

¶ 52   As to the fourth factor, it was undisputed that plaintiff had previous opportunities to

amend. As the trial court noted, he waited nearly three years to file his motion for leave to file his verified amended complaint, he admitted that the facts had not changed, and he admitted that the reason for the amendment was "to create multiple avenues" by which the trial court might reach an outcome in his favor. Plaintiff's argument that the trial court abused its discretion in denying him leave to amend his complaint fails.

¶ 53    We note that there are additional reasons why the trial court correctly denied the motion to amend with respect to the proposed counts for common law fraud and negligent misrepresentation. In opposing plaintiff's motion for leave to file an amended complaint, defendants argued that "collateral estoppel bars plaintiff from relitigating the already decided issues." The trial court acknowledged this argument but based its decision on the factors listed above. Nonetheless, we find defendants' argument well taken.

¶ 54    The doctrine of collateral estoppel applies when (1) an issue decided in the prior adjudication is identical with the one presented in the current suit; (2) the prior suit was terminated with a final judgment on the merits; and (3) the party against whom the estoppel is asserted was a party or in privity with a party in the prior suit. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). Here, a judgment on the merits was entered by the court on November 24, 2010. See *id.* at 84 ("Summary judgment is the procedural equivalent of a trial and is an adjudication on the merits."). With respect to the proposed counts for common law fraud and negligent misrepresentation, the trial court already addressed the issue of misrepresentation raised by those claims. As the trial court concluded:

> "Freedberg has not produced any evidence to support his allegation that McCabe misrepresented any material facts to Freedberg, or that Freedberg reasonably relied on any misrepresentation, material or otherwise, or that McCabe intended Freedberg to rely on any misrepresentation he made."

¶ 55    The trial court did not abuse its discretion in denying plaintiff leave to amend his complaint to add new causes of action for common law fraud, negligent misrepresentation, and negligence. We affirm the trial court's decision denying plaintiff leave to file an amended complaint.

¶ 56                                CONCLUSION

¶ 57    In accordance with the foregoing, we: (1) affirm the decision of the circuit court of Cook County granting summary judgment to defendants on counts I and II of plaintiff's verified complaint; and (2) affirm the court's decision denying plaintiff's motion for leave to file an amended verified complaint adding counts for common law fraud, negligent misrepresentation, and negligence.

¶ 58    Affirmed.