# Illinois Official Reports

## Appellate Court

---

*United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314

---

| | |
|---|---|
| Appellate Court Caption | UNITED CONVEYOR CORPORATION, Plaintiff-Appellant, v. ALLSTATE INSURANCE COMPANY, as Successor in Interest to NORTHBROOK INSURANCE COMPANY, NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY, and NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY; THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA; COLUMBIA CASUALTY COMPANY; FEDERAL INSURANCE COMPANY; TIG INSURANCE COMPANY, Formerly Known as INTERNATIONAL INSURANCE COMPANY; NATIONAL SURETY CORPORATION; and ST. PAUL SURPLUS LINES INSURANCE COMPANY, Defendants (The Travelers Indemnity Company; Travelers Casualty and Surety Company, Formerly Known as The Aetna Casualty and Surety Company, Defendants-Appellees). |
| District & No. | First District, Second Division<br>Docket No. 1-16-2314 |
| Filed | December 5, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-30321; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed; protective order vacated. |

Counsel on
Appeal

Jenner & Block LLP, of Chicago (Barry Levenstam, Christopher C. Dickinson, and Jennifer S. Senior, of counsel), for appellant.

Dentons US LLP, of Chicago (Donna J. Vobornik, Steven L. Merouse, and Shannon Y. Shin, of counsel), for appellees.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion. Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    In this insurance declaratory judgment action, the insured, plaintiff United Conveyor Corporation (United), appeals the trial court's entry of summary judgment in favor of the insurers, defendants The Travelers Indemnity Company and Travelers Casualty and Surety Company (Travelers), claiming the trial court erred in finding that United's asbestos related losses resulted from the single occurrence of continuous manufacturing and selling ash-handling conveyor systems containing asbestos parts. The insurance policies carried a higher aggregate limit than the per-occurrence limit.[1] United claims that the asbestos losses should have been characterized as multiple occurrences because the asbestos exposure resulted from the separate installation and maintenance of the custom-designed conveyor systems. United also claims the trial court abused its discretion in denying United's motion for leave to amend its complaint after entry of summary judgment in Travelers' favor because the proposed amendment would have conformed the complaint to the arguments the parties raised during the summary judgment hearing and to the evidence adduced during discovery. Finding no error in the trial court rulings, we affirm.

¶ 2                                    BACKGROUND

¶ 3    Founded in 1920, United is a family owned engineering company. United's business consists of designing, manufacturing, and selling ash-handling conveyor systems for coal plants according to each customer's individual specifications. United's ash-handling conveyor systems remove ash and other byproducts from furnaces where coal is burned and transport the ash to holding tanks through pipes sealed with gaskets. The gaskets prevent ash from escaping into the air. United's customers installed, operated, and maintained each conveyor system. A United field engineer would, as needed, assist customers with the system's assembly, installation, initial operation, and maintenance, but United did not independently install and maintain the conveyor systems.

¶ 4    United designed each conveyor system according to its customer's specifications and supplied various component parts, including nuts, bolts, rivets, and cement used to assemble

_____

[1]The combined difference that Travelers would have to pay adopting a multiple occurrence position instead of a single occurrence position is $9.65 million.

the system. From the 1930s to early 1984, United sold asbestos-containing gaskets manufactured by a third party that were used as a component in the conveyor system's assembly. In the 1930s, United also sold raw chysotile asbestos supplied by third parties and Lumnite cement that United's customers would mix with water to form asbestos cement. The cement was used on gaskets to create an airtight and heat-resistant seal between pipes in the conveyor systems. From the 1940s through 1979, United compounded and sold the brand name product "Nuvaseal" cement for use in the assembly, installation, and maintenance of the conveyor systems. United mixed asbestos fibers and Lumnite cement to form the Nuvaseal product, to which United's customers added water, forming the cement sealant. Nuvaseal was an ancillary component in the conveyor system.

¶ 5     Gaskets were used, as necessary, in the assembly of and as replacement parts for United's conveyor systems. Repairing a gasket involved chipping off hardened Nuvaseal. Not all of United's conveyor systems required asbestos containing products. Asbestos generally was a component in conveyor systems operating under high temperatures that required sealants to withstand the intense heat expelled from coal burners, but asbestos was unnecessary in systems operating at low temperatures.

¶ 6     From 1952 to 1977, Travelers issued United several primary-level comprehensive general liability and umbrella liability policies. Travelers issued 22 policies from December 3, 1952, to December 31, 1974, which had aggregate limits that were higher than the per-occurrence limits.[2] In these policies, the term "occurrence" was consistently defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury." The number of occurrences determined whether the policies' per-occurrence limits or higher aggregate limits applied.

¶ 7     Beginning in 1983, United was named as a defendant in thousands of lawsuits filed in multiple jurisdictions by individuals claiming to have sustained bodily injury allegedly from inhaling asbestos fibers from asbestos containing products in United's conveyor systems while installing, maintaining, or repairing the systems. Travelers defended United against the suits under a full reservation of rights. In particular, Travelers reserved the right to enforce the policies' applicable "limits of liability."

¶ 8     On January 21, 2009, United received a letter from Travelers, stating the insurer's position that "all of the primary policies issued by Travelers to United have been exhausted," which United interpreted to mean that the policies' per-occurrence, and not the aggregate, limits applied. The record contains no contemporaneous writings reflecting United's disagreement with this position or its belief that, until 2009, Travelers treated the design and installation of each conveyor system as a separate occurrence.

¶ 9     More than three years later, on August 8, 2012, United filed a complaint, seeking a declaration that the asbestos claims constituted multiple occurrences, triggering the policies' higher aggregate limits and not the per-occurrence limits. United's complaint also included a breach of contract count, asserting that Travelers' treatment of the asbestos losses as a single occurrence breached the policies' terms and conditions.

¶ 10    After several years of litigation, United filed a motion for partial summary judgment, asserting that the underlying asbestos claims arose out of multiple occurrences—the

_____

[2]The policies Travelers issued from December 31, 1974, to December 31, 1977, contained identical per-occurrence and aggregate limits, and those policies are not at issue in this appeal.

installation and ongoing maintenance of each of the conveyor systems—and that Travelers breached the insurance policies by contending that the underlying asbestos claims arose from a single occurrence. United also asserted that Travelers waived and was estopped from asserting the argument that the underlying asbestos bodily injury claims constituted a single occurrence because Travelers failed to reserve its rights under the policies, given that it treated and defended United's asbestos losses as multiple occurrences for decades.

¶ 11      On March 13, 2015, Travelers cross-moved for summary judgment, asserting that the underlying asbestos claims arose from a single occurrence because they were based on United's continuous manufacture and sale of conveyor systems containing asbestos components. Travelers also asserted that United's waiver and estoppel claims were themselves waived because the claims were not included in United's complaint. United opposed Travelers' cross-motion for summary judgment, but United did not move to amend its complaint in response to Travelers' assertion that it was precluded from pursuing its waiver and estoppel claims because they were not pled in the complaint.

¶ 12      During the litigation, the parties stipulated that,

> "[f]or purposes of determining the limit of [Travelers'] liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

¶ 13      On January 25, 2016, after a hearing on the summary judgment motions, the trial court denied United's motion and granted Travelers' motion, finding that the underlying asbestos claims arose from the continuous manufacture and sale of the conveyor systems that used asbestos containing materials, which constituted a single occurrence. The trial court declined to rule on the merits of United's waiver and estoppel claims because they were not raised in United's complaint.

¶ 14      On February 16, 2016, United filed a motion for leave to amend its complaint to add a cause of action and supporting factual allegations, seeking a declaration that Travelers waived the ability to assert that the asbestos claims arose from a single-occurrence or, alternatively, was estopped from asserting that position. Travelers opposed the motion, asserting that United failed to establish the factors required under *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992), to warrant a postsummary judgment amendment to a complaint. After considering the *Loyola* factors, the trial court denied United's motion for leave to amend, finding that United did not meet its burden. Because cross-claims among the defendants remained pending, the trial court entered a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was no just reason to delay enforcement or appeal of its rulings. United timely appealed the trial court's summary judgment rulings and the denial of its motion for leave to amend.

¶ 15                                       ANALYSIS

¶ 16      We must first address the fact that the entire record in this case, as well as the parties' briefs, has been filed under seal. The parties' motion to seal the record and briefs was granted by another panel of this court before the briefs were filed and there was any opportunity to examine in detail the substantial record.

¶ 17      We have now had the opportunity to examine both the record and the briefs, and we fail to see any justification for maintaining this case under seal. There have been countless lawsuits

over the past several decades involving insureds seeking coverage for asbestos-related personal injury claims. We are unaware of any practice to place these publicly-filed lawsuits under seal.

¶ 18    United represents that in the trial court, the parties entered into an agreed protective order, which the trial court approved. But instead of selectively designating truly confidential material pursuant to that order, the parties, evidently by agreement, designated virtually everything produced in discovery, entire deposition transcripts, and their briefs on summary judgment as confidential. This wholesale effort to keep vast amounts of information out of the public record is unwarranted.

¶ 19    Judicial records and documents are presumptively open to the public. *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 230 (2000). Our supreme court has deemed public access to court records "essential to the proper functioning of a democracy" because "citizens rely on information about our judicial system in order to form an educated and knowledgeable opinion of its functioning." *Id.* Public access to court files is essential to the public's right to monitor the functioning of the court system to ensure quality, honesty, and respect for our legal system. *Id.*; see also *Coy v. Washington County Hospital District*, 372 Ill. App. 3d 1077, 1079 (2007). The desire of litigants to restrict public access to judicial records is an insufficient basis to override the presumption of openness. "Courts cannot honor such requests without seriously undermining the tradition of an open judicial system." *In re Marriage of Johnson*, 232 Ill. App. 3d 1068, 1075 (1992). We caution trial courts that placing essentially an entire court file under seal is warranted only in the most compelling circumstances, which we do not find exist here.

¶ 20    Since 1983, United has been a defendant in, by its own count, thousands of asbestos-related lawsuits filed across the country. There has been, no doubt, extensive discovery conducted by the plaintiffs in those lawsuits regarding the ash-conveyor systems designed by United, including what asbestos-containing components were furnished as part of those systems. Despite the fact that United ceased using asbestos-containing parts and materials in its systems in 1984, it contends that the public disclosure of the design of those systems could cause it competitive harm. But United points to no engineering drawings contained in the record, let alone those that could even arguably support the conclusion that decades-old designs using since-discontinued materials and parts could place United at a competitive disadvantage.

¶ 21    United also seeks to maintain the secrecy of the record and briefs on the ground that they disclose privileged communications between defense counsel and United in the underlying cases. Citing *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178 (1991), United claims that attorney-client communications between it and its defense lawyers should be protected from disclosure to its adversaries in the underlying cases, a proposition with which we do not disagree. But United has failed to identify in this record a single such communication relevant to the issues we are called upon to decide. For example, United points to the testimony of Michael Heintzman, its national coordinating counsel, whose deposition transcript has been sealed. But the portions of its briefs United identifies as discussing that testimony reveal only that United never settled asbestos claims "absent a reasonable anticipation of liability" and that the "key thing," according to Heintzman, was that the plaintiff "had to be able to show exposure to [an] asbestos-containing component within the system." Heintzman also revealed that in depositions of plaintiffs in the underlying lawsuits, defense counsel tried to elicit whether there was any "real exposure that was sufficient that it could cause disease" and would ask whether the plaintiff "actually work[ed]

on the system" or "actually attach[ed] any component that might have contained asbestos." None of this would come as a surprise to an attorney representing a plaintiff pursuing a personal injury claim based on exposure to asbestos.

¶ 22    United also cites as confidential testimony from Michael W. Jacobs, a consultant overseeing United's litigation activity. Again, an examination of the portions of United's briefs discussing Jacobs's testimony reveals nothing remotely confidential. For example, Jacobs testified that the Nuvaseal cement and gaskets supplied to United's customers were "ancillary components" of its ash conveyor systems, an argument that United raises here and has no doubt raised in most of the underlying lawsuits. Jacobs also refers to a nearly 20-year-old letter from a defense lawyer in an underlying case referring to the "great variability" in United's ash conveyor systems and the necessity for United's staff to review drawings and field service reports for each system to determine "what kinds of systems were installed and when; what types of asbestos materials were used in the assembly, what kinds of asbestos materials were used to maintain the system and how frequently they were replaced." Undoubtedly, this is precisely the type of information sought in discovery by the underlying plaintiffs.

¶ 23    Finally, United contends that loss run reports provided by Travelers identify underlying plaintiffs by name and would thus disclose settlement amounts in those cases. But United does not represent that confidentiality was a condition of the settlements reached with underlying claimants, and so we decline to find that such information should be maintained under seal.

¶ 24    In short, we can discern no reason why this case warrants the extraordinary step of maintaining the entire record on appeal and the briefs under seal. We, therefore, vacate the January 20, 2017, order allowing the same.

¶ 25    United first claims that the trial court erred in entering summary judgment in Travelers' favor based on its finding that the asbestos claims resulted from a single occurrence. United asserts that the underlying asbestos claims did not relate to the continuous or repeated exposure to asbestos arising out of a single occurrence under the policy, but from separate occurrences relating to each conveyor system's installation and maintenance.

¶ 26    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012); *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). We review *de novo* the trial court's ruling on a motion for summary judgment (*Williams*, 228 Ill. 2d at 417) as we do the trial court's interpretation of the provisions of an insurance policy (*Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005)).

¶ 27    Both parties recognize that Illinois has adopted the "cause" theory of liability to determine the per-occurrence limit, or stated differently, whether a single or multiple incidents occurred. *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 420 (2006); *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 648 (1994). Under the "cause" theory, the number of occurrences is decided by determining the cause of the damage rather than looking at the consequences of the damage. *Gypsum*, 268 Ill. App. 3d at 648. In contrast, the "effect" theory of liability looks to the consequences of the damage—the number of individual claims or injuries. *Id.* at 648-49.

¶ 28        United asserts that *Nicor*, which treated 195 instances of the release of mercury as separate occurrences, is dispositive. Travelers contends *Gypsum*, where 200 claims for property damage resulting from Gypsum's manufacture and sale of asbestos containing building materials were considered a single occurrence, warrants affirmance.

¶ 29        In *Nicor*, the issue was whether Nicor, a supplier of natural gas to residential customers, was required to satisfy the single occurrence self-insured retention (or deductible) for each property damage claim against it or whether the claims arose from a single course of conduct so that Nicor was only required to satisfy one deductible. *Nicor*, 223 Ill. 2d at 416. The deductible was a minimum of $100,000 per occurrence. *Id.* at 414. The practical effect of the ruling was that if Nicor was required to satisfy a deductible for each claim, it would likely be unable to access insurance coverage at all, since the value of most of the property damage claims was less than the single occurrence deductible.

¶ 30        The case arose from Nicor's replacement of natural gas regulators in its customers' residences. *Id.* at 411. Although the vast majority of replacements in approximately 300,000 homes were accomplished without incident, about 195 homes were exposed to mercury that spilled from the natural gas regulators. *Id.* at 412, 434. Our supreme court observed that if the loss resulted from the manufacture and sale of defective products—the regulators containing mercury—the loss would have emanated from a single cause, and there would be one occurrence under the applicable polices. *Id.* at 432. Ultimately, the court held that each asserted loss arising from the replacement of the regulators was a separate occurrence caused by independent intervening negligence of the workers who replaced the meters. *Id.* at 431-32. The court observed that Nicor's liability arose only when mercury spilled from an old-style regulator that was being replaced with a new mercury-free regulator. *Id.* at 433. Specifically, the court noted that the mercury spills were extremely rare, sporadic, lacked a common cause, and were not derived from "one event" or an uninterrupted process. *Id.* at 433-34. The court concluded that the cause of the mercury exposure was the negligent replacement of the meters and not the actual presence of mercury in the meters. *Id.* at 432-33. Because the negligent removal of the meters caused the mercury exposure and ensuing property damage, which was not necessarily repeated in each customer's home, the court determined that each of the 195 mercury spills constituted a separate occurrence and, thus, Nicor was required to satisfy the deductible for each occurrence. *Id.* at 434-35.

¶ 31        In *Gypsum*, the insured, Gypsum, manufactured and sold asbestos containing building materials. *Gypsum*, 268 Ill. App. 3d at 647. More than 200 property damage claims[3] were brought resulting from the installation of Gypsum's products in schools and other public buildings. *Id.* at 607. Gypsum, seeking to avoid liability for multiple per occurrence deductibles, characterized its conduct in manufacturing and selling asbestos-containing building materials as a single continuous process. *Id.* at 614, 647. Gypsum argued that its conduct fell within the policies' provision for the "continuous or repeated exposure to substantially the same condition," or a "common defect, condition or cause," both of which were treated as a single occurrence. *Id.* at 647-48. After an exhaustive discussion of authorities in Illinois and elsewhere, this court concluded that "[i]t would be unwise and without support in case law to determine that each installation of the asbestos-containing products constituted a

_____

[3]The case also involved personal injury claims against Gypsum, but those claims were severed from the property damage claims and were not at issue in the appeal. *Gypsum*, 268 Ill. App. 3d at 604.

separate occurrence when Gypsum's liability is predicated on its involvement in the manufacture and sale of the products rather than the installation of the products." *Id.* at 651. Because Gypsum engaged in the continuous process and repetitive conduct of manufacturing and selling asbestos containing building materials, the court determined that the 200 property damage claims were the product of a single occurrence. *Id.* at 650-51. Consequently, Gypsum was only obligated to satisfy the single occurrence deductible.

¶ 32    The issue here relates not to whether United must satisfy a single deductible or multiple deductibles, but whether Travelers' liability under the policies is measured by the single occurrence limit or the higher aggregate limits. Indeed, were we considering the same issue presented in *Nicor* and *Gypsum*, we would conclude that United must satisfy only a single occurrence deductible or self-insured retention. But while the context is different, the result should be the same: if an insured's conduct is a single occurrence for purposes of establishing the applicable deductible, it should be the same for purposes of setting the limits of the insurer's liability.

¶ 33    Similar to the insured in *Gypsum*, the cause of United's loss was the continuous manufacture and sale of its conveyor systems incorporating asbestos containing products (Nuvaseal and asbestos cement) and gaskets used to create a heat resistant seal in the conveyor system's component parts. The fact that each system was designed to the customer's specifications—and thus the systems were not mass produced—is true, but beside the point. The single, unitary cause of claims against United is the fact that it incorporated asbestos-containing components or products into each of its systems designed for high-heat operations. Contrary to United's position, the cause of its loss was not attributable to the installation and maintenance by United's customers of each conveyor system that contained asbestos products. Likewise, unlike *Nicor*, no separate human intervening event attributable to the conveyor system's installation and maintenance is involved. Specifically, the installation and maintenance by United's customers did not give rise to United's liability; its manufacturing activities did. Based on *Gypsum*, the claims against United related to a single occurrence and, as a consequence, the per-occurrence limit applied.

¶ 34    United next claims that the trial court abused its discretion in denying its motion for leave to amend its complaint to include a count asserting that Travelers waived and was estopped from advocating its position that the losses constituted a single-occurrence based on loss run reports Travelers sent to United, reservation of rights letters, and internal Travelers e-mails. United asserts that until 2009, Travelers shared United's view that the asbestos losses arose from multiple occurrences subject to the higher aggregate limit. United further asserts that Travelers failed to effectively reserve its rights regarding the number of occurrences after it began defending United in the 1980s.

¶ 35    Section 2-1005(g) of the Code of Civil Procedure allows a litigant to amend pleadings upon just and reasonable terms before or after the entry of summary judgment. 735 ILCS 5/2-1005(g) (West 2008). Illinois law adopts a liberal policy regarding amendments of pleadings, but the right is not unlimited, and there is no absolute right to amend a complaint. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 467 (1992); *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶ 41; *Grove v. Carle Foundation Hospital*, 364 Ill. App. 3d 412, 417 (2006). We review the trial court's ruling on a plaintiff's motion to amend a complaint for an abuse of discretion. *Loyola Academy*, 146 Ill. 2d at 273-74; *Freedberg*, 2012 IL App (1st) 110938, ¶ 40; *Martin v. Yellow Cab Co.*, 208 Ill. App. 3d 572, 576 (1990). An

abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005).

¶ 36    In *Loyola Academy*, 146 Ill. 2d at 273, our supreme court articulated four factors a court must consider when ruling on a postsummary judgment motion to amend: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." The party seeking leave to amend bears the burden of demonstrating that all four factors favor the relief requested. *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 220 (2010).

¶ 37    We have considered each of the *Loyola* factors and find that the trial court did not abuse its discretion in denying United's motion for leave to amend. Specifically, United's motion was not timely filed and United had prior opportunities to amend its complaint before the trial court entered its summary judgment rulings. United filed its complaint on August 8, 2012, and litigation proceeded for several years before the trial court ruled on the parties' summary judgment motions on January 25, 2016. United's motion for leave to amend was not timely because United sought to amend its complaint on February 16, 2016—22 days after the trial court entered its summary judgment ruling and more than three years after it filed its complaint. See *Anger v. Gottfried*, 29 Ill. App. 3d 559, 563-64 (1975) (plaintiff's motion for leave to amend—filed approximately 7 months after filing the complaint, 5 months after the defendant's summary judgment motion, and 50 days after the trial court granted summary judgment in defendant's favor—was not timely filed).

¶ 38    Nothing in the record reveals that United relied on the discovery of any new facts to support its untimely request to amend. Indeed, United's purported amendment to include the waiver and estoppel counts relied on facts known to United when (and long before) it filed its complaint. Specifically, United's waiver and estoppel claims relied in large part on its assertion that Travelers' generation of loss run reports, showing that more than the per-occurrence limits had been charged against polices, evidenced Travelers's belief that the higher aggregate limits applied. While we could debate the merits of United's position given Travelers' consistent reservation of its right to invoke the applicable limits of liability in its policies, it is nevertheless obvious that United was aware, when it filed this case in 2009, of what it now claims is Travelers' "change" in position. And United has offered no persuasive argument as to why it was unable to include its waiver and estoppel claims in its original complaint.

¶ 39    Furthermore, to the extent that United claims it relied on additional information disclosed in discovery, such as internal Travelers e-mails, it still offers no justification for its delay in asserting these claims until after it had lost on summary judgment. Indeed, in its own summary judgment motion, United argued that "in 2009, Travelers advised United for the first time that all its primary-level policies had been exhausted, a position apparently based on the incorrect premise that the Asbestos Claims constitute a single 'occurrence.' " United further contended that "Travelers is estopped and/or has waived any right to take a single occurrence position now, having undertaken and handled United's defense while treating the Asbestos Claims as separate occurrences for decades." Thus, United was in possession of all the facts it claims support its waiver and estoppels claims well in advance of the trial court's ruling on the cross-motions for summary judgment. *Martin*, 208 Ill. App. 3d at 577 (motion for leave to

amend properly denied where the same facts were available when the plaintiff filed the motion to amend that were available when the plaintiff filed the complaint 20 months earlier). And Travelers' cross-motion for summary judgment asserted that United was foreclosed from arguing waiver and estoppel because United never pled such claims. Thus, despite sufficient knowledge of relevant facts and an adequate opportunity to do so, United did not seek leave to amend its complaint until after the trial court granted summary judgment in Travelers' favor. Consequently, this *Loyola* factor weighs against granting leave to amend.

¶ 40    Moreover, United's amended complaint was not seeking to cure a defect in the complaint, but to add a new cause of action after the entry of summary judgment in Travelers's favor. United's proposed amended complaint alleged that Travelers waived and was estopped from asserting its position that the losses incurred by United were not separate occurrences, but a single occurrence. See *Jones v. O'Brien Tire & Battery Service Center, Inc.*, 374 Ill. App. 3d 918, 937 (2007) (noting the difference between adding a new cause of action and curing a defective pleading). Importantly, in United's motion for leave to amend its complaint, United expressly stated that it sought to amend its complaint "principally to *add* a cause of action and supporting factual allegations." (Emphasis added.) Consequently, United's amended complaint would not cure a defect in the original complaint, but instead would add the new waiver and estoppel count, as well as new allegations that Travelers *inadequately* reserved its rights on the number of occurrences. Because United sought to add new allegations, particularly regarding the sufficiency of Travelers reservation of rights, Travelers would have been prejudiced by having to defend against an entirely different claim after summary judgment had been entered in its favor more than three years after United filed its complaint. *Hartzog v. Martinez*, 372 Ill. App. 3d 515, 525 (2007). United's postjudgment request to amend is an improper attempt to circumvent the unfavorable summary judgment rulings. *Freedberg*, 2012 IL App (1st) 110938, ¶ 44.

¶ 41    None of the *Loyola* factors favored United's untimely request to amend and, thus, the trial court did not abuse its discretion in denying United's motion.

¶ 42    Because we find that, under *Gypsum*, United's asbestos losses resulted from a continuous and systematic process, Travelers' lower per-occurrence limit applies, and the trial court did not err in entering summary judgment in Travelers' favor and denying United's summary judgment motion. We also find that the trial court did not abuse its discretion in denying United's motion for leave to amend because United failed to satisfy any of the *Loyola* factors. For these reasons, we affirm the trial court's summary judgment rulings and its ruling denying United's motion for leave to amend. Finally, we vacate the January 20, 2017, order allowing the record and the briefs in this case to be filed under seal.

¶ 43    Affirmed; protective order vacated.