# Illinois Official Reports

## Appellate Court

***Tsichlis v. Country Life Insurance Co.*, 2018 IL App (1st) 170826**

| | |
|---|---|
| Appellate Court Caption | KATHRYN TSICHLIS, Plaintiff-Appellee and Cross-Appellant, v. COUNTRY LIFE INSURANCE COMPANY, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-17-0826 |
| Filed<br>Rehearing denied | September 18, 2018<br>October 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-4531; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Glen E. Amundsen, Michael Resis, and Ellen L. Green, of SmithAmundsen LLC, of Chicago, for appellant.<br><br>David S. Klevatt, Timothy M. Howe, and Laura Parry, of Klevatt & Associates, LLC, of Chicago, for appellee. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pucinski and Walker concurred in the judgment and opinion. |

**OPINION**

¶ 1    On December 17, 2011, plaintiff Kathryn Tsichlis reported to the Park Ridge police that her husband John, a real estate developer, had gone missing. Both the police and John's family searched for him, with the help of a private investigator, to no avail. Two months later, John's body was found in the woods near the Tsichlis home. The medical examiner determined that John had died from a self-inflicted gunshot wound to the head.

¶ 2    John had a life insurance policy with Country Life Insurance Company (Country Life), but the policy excluded payment of the death benefit if John committed suicide within two years of the date of the policy. Kathryn sued Country Life for breach of contract because it did not pay the death benefit. At trial, Kathryn won; the trial court also ordered Country Life to pay prejudgment interest.

¶ 3    We hold that the trial court erred in finding for Kathryn; Country Life's policy required "due proof" of John's death, which was never provided. We need not address the other issues raised on appeal. We also reject Kathryn's cross-appeal that the trial court should have allowed her to amend her complaint just before trial and decline to address the issues in her conditional cross-appeal.

¶ 4                                   BACKGROUND

¶ 5    We include only those facts necessary to understanding the issues that control this appeal.

¶ 6    John Tsichlis spent years as a successful real estate developer in the Chicago area. He lived with his wife, Kathryn, and their children in a house near the woods of the Cook County Forest Preserve. But like many real estate developers, John's business suffered during the recession, resulting in a risk of default on a number of outstanding loans with the Lisle Savings Bank. Between 2009 and 2011, John's adjusted gross income fell from about $88,000 to negative $30,703.

¶ 7    Toward the end of 2011, John was forced to renegotiate several loans with the Lisle Savings Bank. These negotiations postponed John's obligations but did not eliminate them.

¶ 8                                The Disappearance

¶ 9    On Saturday, December 17, 2011, Kathryn Tsichlis reported John's disappearance to police. On the bedroom dresser, she had found John's wallet, cell phone, and a cross he always wore. The police took a missing person's report. The next day, notes in John's handwriting were discovered in John's car and office. One paper listed a series of properties that John owned and information about each. Another lamented the tension in his relationship with a friend that arose when a property they tried to develop turned sour. A third listed details of some bank accounts and "life insurance—Bill *** don't think they'll pay," and then discussed his family members: "I love my family and friends so much ***. All my intentions were to make sure they were on solid ground but this market just killed me. Antioch was the nail. *** I should have listened to my dad the best dad of all and I should of slowed down. Get all the money out of the banks and keep your heads up. Be strong. I have lost my mind I think." And a fourth individually addressed family members, including his oldest son: "you are the man now. Don't *** give up for anything. You are stronger than me."

¶ 10    On February 2, 2012, John's body was found in the woods of the Cook County Forest Preserve, not far from the Tsichlis home. John was seated on a pillow, straddling a log. The medical examiner's office conducted an autopsy and concluded that John had committed suicide by gunshot wound. John's death certificate reflected this conclusion.

¶ 11    The Insurance Policy

¶ 12    In August 2010, John had taken out a life insurance policy with Country Life through insurance agent Bill Asimakopoulos, a close family friend. The policy had a $700,000 death benefit and specified that, in the event of John's death, this amount would be paid to the beneficiary "when we receive due proof that the insured's death occurred while this policy was in full force." The policy also stated that "if the insured commits suicide, while sane or insane, within two years from the date of issue, and while this policy is in full force, we will pay a limited death benefit to the beneficiary. The limited death benefit will be the amount of premiums paid for this policy."

¶ 13    On February 14, insurance agent Jeffrey Orman (Asimakopoulos's supervisor) called Country Life and spoke to a phone representative, who filled out a "death claim notification worksheet" based on Orman's call. The worksheet stated that John had committed suicide. This worksheet was passed along to senior claims examiner Barbara Dirks. On February 21, Dirks wrote Asimakopoulos that Country Life had been informed of John's suicide. She asked Asimakopoulos to arrange for Kathryn to provide a death certificate, and to fill out some Country Life forms, so that Country Life could refund the premiums paid on John's policy.

¶ 14    In March 2012, Dirks sent a letter to Kathryn herself, asking her to provide a copy of John's death certificate and to fill out certain forms so that Country Life could process the claim. Kathryn did not respond; nevertheless, Dirks continued sending similar letters (about once a month) for over a year. Kathryn never responded to these letters.

¶ 15    The Lawsuit

¶ 16    Kathryn filed a complaint against Country Life, alleging breach of contract, negligence, and bad faith. Country Life filed a counterclaim for declaratory judgment, arguing that Kathryn had not provided it with the necessary information to pay any benefits, and in any event, John had committed suicide within two years of issuance of the policy, so Kathryn could receive only a limited benefit (refund of the premiums). Country Life attached a copy of John's death certificate, which listed John's cause of death as "gunshot wound to the head" and manner of death as "suicide." Country Life then answered the complaint, including the affirmative defense that John had committed suicide. Kathryn voluntarily dismissed the bad faith count, and the parties proceeded to trial only on the breach of contract count.

¶ 17    In September 2016, less than three months before the scheduled trial date, Kathryn moved to reinstate the bad faith count.

¶ 18    The Trial

¶ 19    Kathryn Tsichlis

¶ 20    Kathryn Tsichlis testified that she did not recall Asimakopoulos asking her to fill out any forms to process John's claim, but did remember getting letters from Dirks. She admitted that she had a copy of the death certificate, but did not supply it (or any other information) to Dirks

or contact Country Life to discuss the matter. Kathryn explained that she had been grieving for John and felt that it was not her job to supply the information.

¶ 21                                   Bill Asimakopoulos

¶ 22    Bill Asimakopoulos testified that he had known John since junior high school, knew the Tsichlis family well, and had spoken to John three or four times a week. He had sold John a $700,000 life insurance policy in 2010. During that sale, he had reviewed the policy's suicide provision with John.

¶ 23    Asimakopoulos heard from John's brother and Kathryn that John had committed suicide, so he told this to his manager, Jeff Orman, who relayed that information to Country Life. He received Dirks's request for the death certificate and other forms. Usually, Asimakopoulos would collect these documents from a beneficiary and forward them to Country Life. Despite Asimakopoulos having discussed it with Kathryn several times, she never gave him the death certificate. His relationship with the Tsichlis family gradually deteriorated until the suit was filed.

¶ 24                                   Barbara Dirks

¶ 25    Barbara Dirks testified that though she contacted Asimakopoulos and Kathryn repeatedly, she never received a death certificate or any other forms from either of them. She contacted Kathryn directly because the law required her to do so. Though the death claim notification worksheet reflected that John had committed suicide, Dirks still needed some type of official document reflecting that to process the claim. She sent Kathryn letters seeking this information every month without response, until Kathryn filed suit against Country Life.

¶ 26                                   The Verdict

¶ 27    The trial court issued a written order finding for Kathryn, but denying her leave to reinstate the bad faith count. The trial court rejected Country Life's contention that Kathryn did not provide "due proof," finding that the policy did not require her to provide any particular documentation and no evidence established that her failure to do so prejudiced Country Life. Next, the court held that Country Life had not proven suicide by clear and convincing evidence and entered judgment in favor of Kathryn in the amount of the $700,000 policy, plus prejudgment interest at 9%, accruing from February 2, 2012 (the date John's body was discovered and the official date of death).

¶ 28    Country Life filed a timely notice of appeal, and Tsichlis cross-appealed.

¶ 29                                   ANALYSIS
¶ 30                                "Due Proof" of Death

¶ 31    Country Life argues that Kathryn did not provide it with "due proof" of John's death, as required by the policy, because she never sent Country Life a copy of John's death certificate or the associated forms that Country Life would have used to process the claim. Kathryn argues that the policy did not specifically require the death certificate and that, in any event, Country Life eventually obtained the death certificate.

¶ 32    The policy stated that once Country Life "receive[s] due proof that the insured's death occurred while this policy was in full force," benefits would be paid. This provision is not

unique to Country Life policies, as the Illinois Insurance Code requires it. See 215 ILCS 5/224(1)(j) (West 2012) (all policies must contain a provision that settlement shall be made "upon receipt of due proof of death"). The policy itself does not define "due proof."

¶ 33 We construe the language of an insurance policy to give effect to the parties' intent. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006). "Due proof" has been defined as " 'a statement of facts, reasonably verified, as, if established in court, would *prima facie* require payment of the claim.' " *Zorger v. Prudential Insurance Co. of America*, 282 Ill. App. 444, 448 (1935). This definition remains unchanged by subsequent precedent, and given that the term is used in the current statute, we see no need to rewrite that definition. It also conforms with a contemporaneous term, "sufficient proof of death," used in the insurance context, defined as "evidence in any form which is substantial and trustworthy enough to enable the insurer to form an intelligent estimate of his rights and liability under his contract." *Anderson v. Inter-State Business Men's Accident Ass'n of Des Moines*, 354 Ill. 538, 546 (1933).

¶ 34 We agree with Kathryn that "due proof" does not require any particular document (including a death certificate). See *Zorger*, 282 Ill. App. at 448. If Country Life wanted to require a certified death certificate as its "due proof," then it could have stated so explicitly in the policy. The same applies to the various forms that Dirks asked Kathryn to complete. But Kathryn (and the trial court) read "due proof" too broadly. Kathryn seems to argue that as long as Country Life received some sort of notice of John's death, that was enough. The trial court considers whether the absence of "due proof" caused prejudice to Country Life. Both Kathryn and the trial court ignore the recognized definition of "due proof."

¶ 35 That definition (and the similar one for "sufficient proof of death") requires more than mere *notice* of a subject's death. Instead, it requires proof, *i.e.*, something that has been "reasonably verified" that could be "established" to a "*prima facie*" standard. This case violates that standard in two ways. First, the only information that Country Life received from Kathryn (or Asimakopoulos, who was acting on her behalf at that point) was the phone call that led to the death notification worksheet. Apparently, no one ever provided Country Life with any documentation that could be "reasonably verified," to show that John had actually died. Only a double hearsay statement over the phone.

¶ 36 Second, the statement from Asimakopoulos's office was internally contradictory as to Country Life's responsibility to Kathryn. Country Life had been informed of John's death and also informed of John's apparent suicide. This would certainly affect whether " 'payment of the claim' " was required " '*prima facie*.' " *Zorger*, 282 Ill. App. at 448; see also *Anderson*, 354 Ill. at 546 (evidence must allow insurer to form "intelligent estimate" of liability). The policy contains explicit language limiting the benefit if the insured committed suicide within two years of issue. We must consider the suicide clause equally relevant when considering whether due proof has been given. *Country Mutual Insurance*, 222 Ill. 2d at 311 (insurance policy must be construed as whole, giving effect to every provision).

¶ 37 The trial court's statement that Country Life was not "prejudiced" appears to rely on Country Life having obtained John's death certificate on its own after Kathryn filed the lawsuit. That does not save Kathryn from responsibility. The policy states that Country Life will pay the benefit when it "receive[s]" the due proof. Its responsibility to investigate the claim further only starts after receiving that due proof. That Country Life obtained the death certificate after Kathryn sued it does not obviate her responsibility under the policy before suit.

(Kathryn, knowing that the death certificate stated that John had committed suicide, had no motivation to help Country Life process a claim that would result in her receiving the paid premiums rather than the full death benefit.)

¶ 38    The trial court erred in finding that Kathryn had provided "due proof" to Country Life. Given this failure, her breach of contract claim must fail. We reverse the trial court's judgment. We need not address the other issues on appeal.

¶ 39                    Cross-Appeal: Reinstatement of "Bad Faith" Count

¶ 40    On cross-appeal, Kathryn argues that the trial court erred in denying her leave to amend her complaint to reinstate a count of "bad faith" by Country Life. We review a trial court's decision of whether to allow a party to amend its pleading under an abuse of discretion standard. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992). To determine whether the trial court abused its discretion, we consider four factors: (1) whether the proposed amendment would cure a defect in the pleading, (2) whether the opposing party would be prejudiced or surprised by the amendment, (3) whether the amendment is timely, and (4) whether the amending party had previous opportunities to amend the pleading. *Id.* at 273.

¶ 41    Kathryn urges us to scrutinize only the second factor, whether Country Life would have been prejudiced, and does not argue the others. We will not weigh one factor over the others, particularly where the three remaining factors weigh so heavily against Kathryn.

¶ 42    The proposed amendment did not cure any defect; Kathryn wanted to add a different cause of action. She included the bad faith count in the original complaint, then voluntarily dismissed it about 18 months later, only to move to amend and re-add the bad faith count less than three months before trial. The amendment certainly was not timely, and Kathryn had multiple opportunities (over the course of almost two years) to file the amendment. See *United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314, ¶ 37 (amendment filed more than three years after original complaint was not timely filed, and plaintiff had multiple opportunities to amend earlier); *cf. Loyola Academy*, 146 Ill. 2d at 275 (trial court should have allowed amendment filed well before trial date, and plaintiff had tried to amend complaint several times before hearing); *Taylor, Bean, & Whitaker Mortgage Corp. v. Cocroft*, 2018 IL App (1st) 170969, ¶ 47 (trial court did not abuse discretion in allowing amendment, where amendment was filed at beginning stage of case before defendant entered appearance). Given these facts, the trial court did not abuse its discretion in denying Kathryn leave to amend the complaint.

¶ 43                            Conditional Cross-Appeal Issues

¶ 44    Kathryn also urges us, in her "conditional cross appeal," to rule on a pair of evidentiary issues that the trial court decided against her at the original trial. Illinois courts disapprove of issuing advisory opinions. We do not review cases " 'merely to establish a precedent or guide future litigation.' " *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10. We will not rule on these issues.

¶ 45    Reversed.